# FOR PUBLICATION



ATTORNEY FOR APPELLANT:

**MATTHEW D. ANGLEMEYER**
Marion County Public Defender
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**BRIAN REITZ**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| JULIAN TUGGLE, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 49A05-1308-CR-413 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Grant W. Hawkins, Judge
Cause No. 49G05-1301-MR-1125

**May 22, 2014**

**OPINION–FOR PUBLICATION**

**BAKER, Judge**

This case is about an individual who initially lied to the police when he told them that he was only a victim of an armed robbery and shooting. In actuality, the evidence later showed that appellant-defendant Julian Tuggle was also an actual perpetrator of Murder,[1] a felony.

After Tuggle was admitted to Wishard Hospital (Hospital) in Indianapolis with a gunshot wound, a police detective was dispatched to the scene, commenced an investigation, and secured the clothing that Tuggle had worn into the hospital. The detective inferred that the clothing that Tuggle wore when the crimes were committed contained evidence of a crime, including a bullet hole and/or blood.

Although the detective seized the bag of Tuggle's clothing, no search or DNA testing was performed on the items until the police obtained a search warrant. However, after various tests were conducted on the clothing, a reported murder victim's DNA was discovered on Tuggle's clothing that the detective had secured. Tuggle was tried, convicted, and sentenced for the victim's murder.

Tuggle challenges the detective's seizure of the bag and the admission of the clothing into evidence, as well as the sufficiency of the evidence. We conclude that Tuggle's Fourth Amendment Rights under the United States Constitution and his rights in accordance with Article I Section 11 of the Indiana Constitution were not violated. The evidence demonstrated that the detective acted lawfully and reasonably in seizing the bag of Tuggle's clothing without a warrant. Also, the evidence was properly

---

[1] Ind. Code § 35-42-1-1.

admitted at trial, and we conclude that the evidence was sufficient to support Tuggle's

conviction for murder. Thus, we affirm the judgment of the trial court.

FACTS[2]

While in high school in Indianapolis, Tia Brady dated both Michael Torres and

Darnell Lindsay. However, after graduating, Brady married another man and moved to

Florida with him. The couple had a son and eventually started experiencing marital

difficulties. Brady left Florida while her husband was deployed overseas in the air force

and spent the summer of 2010 in Indianapolis at her mother's house. That summer,

Brady rekindled her romance with Torres.

Although Brady returned to Florida for a while, Torres sent Brady $300 to come

back to Indianapolis and stay with him. Brady agreed to return and later found out that

Lindsay was also back in Indianapolis. Although Brady and Torres got along for a

while, she eventually decided to stop talking to him and started dating Lindsay almost

immediately.

On one occasion, Torres went to Brady's house, but she refused to talk to him.

Torres then began messaging Brady through Facebook. On December 19, 2011, when

Brady and Lindsay were living together at an apartment on Lily Lane in Indianapolis,

Lindsay posted a message about Torres on Facebook. That same evening, Torres

---

[2] We held oral argument in Indianapolis in our Supreme Court Courtroom on April 15, 2014. We commend counsel for their excellent oral presentations, and we thank the students from the McKinney School of Law who attended the argument.

telephoned Brady's mother and stated that he was surprised about the message that Lindsay had posted.

At approximately 10:30 p.m. that evening, Richard Morales and Destiny Armstrong picked up Lindsay and drove him to a gas station. Tuggle and Torres drove to Brady's residence. At that time, Torres stated that he wanted to speak with Brady. Tuggle went with him, and they knocked on Brady's door. Brady looked through the eye-hole and noticed that Torres was holding a firearm. Torres, who Brady described as "angry," demanded that she either open the door or he would shoot through the door. Tr. p. 195, 226-27. Brady was frightened so she hid in the bathtub and called 911.

At about this time, Lindsay returned to the apartment in Morales's vehicle. Lindsay saw people inside the doorway to his apartment and Morales explained that Lindsay became angry, stated "let me out . . . my girl is in there," and angrily asked, "who the f*ck is at my house?" Id. at 245-46. Lindsay ran inside, and Armstrong noticed an individual standing inside with a gun. Brady then heard the apartment's security door shut, some scuffling, and a gunshot. Morales and Armstrong, who were outside in their vehicle, heard two gunshots, started to drive away, and then heard another gunshot. Morales saw several people flee the scene running, but saw two men walking away who appeared to be unafraid. Morales subsequently explained that those two people "didn't look like they were running for their lives. Everybody else was scattering like roaches." Id. at 253. Tuggle and Torres returned to the vehicle and drove away. Morales then dialed 911.

4

A neighbor, Andre Maurice Majors, also heard people fighting that evening, looked outside of his apartment, and saw Lindsay holding his right leg. Lindsay told Majors that he had been shot. Lindsay knocked on his apartment door, Brady opened it, and Lindsay fell inside. Majors then called 911. Brady saw a gun that she did not recognize, and placed it in a safe because she did not want Lindsay to be in any legal trouble.

Several Indianapolis Metropolitan Police Officers (IMPD) were dispatched to the scene and saw Lindsay on the ground lying halfway inside of the apartment. Just before Lindsay died of three gunshot wounds, he told the officers that Torres was involved in the shooting, and Brady gave the officers the gun that she put in the safe. Brady also told the officers that Tuggle was Torres's friend. Four spent shell casings were recovered from the scene, along with two spent bullets.

Later that evening, Torres called Brady's mother and told her that Lindsay had shot Tuggle. The next morning, Brady's mother found out the seriousness of Lindsay's injuries and again spoke to Torres. Torres expressed remorse, saying that he had "messed up," and "shouldn't have did it." Tr. p. 340. Torres also stated that he was going to turn himself in. Id.

Upon leaving the scene of the shooting, Torres drove Tuggle to Wishard Hospital where medical personnel—as is their typical routine in preparing to treat traumatic-injury victims for medical procedures—removed Tuggle's clothing and placed his clothing in a bag. Moreover, as part of their standard operating procedure, the hospital

5

reported to IMPD that a gunshot victim had arrived at the hospital. In response, IMPD dispatched an officer to the hospital. Detective Greg Hagan arrived at Wishard at approximately 11:45 p.m. on the evening of the shooting, introduced himself to Tuggle, and began interviewing him. Tr. p. 382. Tuggle was described as alert and conscious and told Detective Hagan that he had been playing a dice game at the Meadows apartments, and that one of the other players shot and robbed him of $360. Tuggle specifically stated that he was shot at 4126 Meadows, in the basement of the apartment. Because Detective Hagan believed that Tuggle was a gunshot victim and had no reason to believe that he was involved in the other shooting, he took Tuggle's clothing to the crime lab in accordance with police procedure.

Detective Hagan subsequently learned that other IMPD detectives had responded to a shooting scene on Lily Lane around 11:00 p.m. that evening. Detective Hagan left Wishard and went to that location to see if he might assist with the investigation. Other officers informed Detective Hagan that Tuggle was mentioned as an acquaintance of Michael Torres, the shooting suspect. However, nothing indicated that Tuggle himself was a suspect. Detective Hagan had no further involvement in either the investigation of the shooting on Lily Lane or with regard to Tuggle's shooting.

IMPD Detective Thomas Lehn eventually became the lead detective in the Lindsay shooting. Initially, Tuggle was not a suspect in Lindsay's shooting. No eyewitness placed Tuggle at the Lily Lane address, and Tuggle again asserted that he was a shooting victim at the Meadows.

6

On February 10, 2012, Detective Lehn spoke with Tuggle, and Tuggle again maintained that he had been shot at the Meadows. Because of the coincidental timing of the shootings, Detective Lehn sought and obtained a search warrant to perform a buccal swab on Tuggle and for forensic testing on his clothing. Detective Lehn performed the swab testing on Tuggle, but he was not arrested because at the time, there was no evidence of Tuggle's involvement. However, Tuggle's clothing was subsequently tested and his jeans, shirt, and socks, and shoes tested positive for Lindsay's blood. Because of the evidence that linked Tuggle to Lindsay's shooting, the State charged Tuggle with murder on January 4, 2013.

Tuggle subsequently moved to suppress the DNA evidence, claiming that his clothing had been illegally seized. The trial court initially explained that

> I show up at the hospital, I've been shot. If I'm telling the truth or if I'm lying and I got shot wherever I say I got shot and a detective is standing bedside, it's common practice for that detective to gather the clothing. To say it would be destroyed—I don't think—because you're dealing with someone who is potentially a victim at that point and you are preserving evidence on a separate case, where as you are looking for someone who may have shot this person.

Following an evidentiary hearing, the trial court denied Tuggle's motion to suppress, holding that

> The Court finds as a matter of fact that Defendant Tuggle was not considered to be a "suspect" in the commission of any crime at the time of the seizure of clothing alleged to belong to him. The Court finds as a matter of fact that neither incriminating nor exculpatory information or material was derived from any clothing alleged to belong to Defendant Tuggle prior to the acquisition of a search warrant to examine same, which was approved on January 20, 2012. It should be noted that the court has not been presented with any evidence that Defendant

7

Tuggle made attempts to reacquire any property that may have been removed from his person or presence while being treated at Wishard Hospital.

Utilizing the Litchfield balancing test, the Court has minimal concern, suspicion or knowledge that any violation of Defendant Tuggle's constitutional protections has occurred. The Court further finds that while any warrantless seizure of property by the government can be classified as intrusive, the collection of clothing from an individual presenting himself as a shooting victim seeking medical attention at a local hospital does not rise to the level of "intrusiveness" that requires judicial intervention to deter similar conduct by the government.

Appellant's App. p. 64-65.

Tuggle testified at trial and admitted that he lied to the police during the investigation about where he had been shot. Tuggle claimed that Torres and Lindsay fought that night and that, during the fight, Lindsay shot Tuggle. Tuggle claimed that he lied to the police because he "didn't feel [he] was in any trouble since [he] wasn't a suspect." Tr. p. 569.

A jury found Tuggle guilty as charged and he was subsequently sentenced to fifty years of incarceration. Tuggle now appeals.

DISCUSSION AND DECISION

I. Standard of Review—Generally

We initially observe that, because Tuggle is appealing after a completed trial, the issue is properly framed as whether the trial court abused its discretion in admitting the challenged evidence at trial. Lindsey v. State, 916 N.E.2d 230, 238 (Ind. Ct. App. 2009). When reviewing for an abuse of discretion, we reverse only if the trial court's decision is clearly against the logic and effect of the facts and circumstances before it.

8

Id. We do not reweigh evidence, and we consider any conflicting evidence in the light most favorable to the trial court's ruling. Id. We consider any uncontested evidence favorable to the appellant. Atkinson v. State, 992 N.E.2d 899, 901 (Ind. Ct. App. 2013).

## II. Search and Seizure

### A. Tuggle's Fourth Amendment Claims

Tuggle contends that the trial court erred in admitting the clothing that the police seized from his hospital room into evidence. More particularly, Tuggle argues that his property and privacy rights under the Fourth Amendment to the United States Constitution were violated because he "never gave up his property rights in his clothes before [Detective] Hagan took them and never intended to abandon or discard them." Appellant's Br. p. 8.

The Fourth Amendment protects persons from unreasonable search and seizure and this protection has been extended to the states through the Fourteenth Amendment. Mapp v. Ohio, 367 U.S. 643, 650 (1961). The paramount concern of the Fourth Amendment is the reasonableness of the State's intrusion into the privacy of its citizens. Adams v. State, 762 N.E.2d 737, 740 (Ind. 2002). The reasonableness of a search is determined by balancing the degree to which it intrudes upon an individual's privacy with the degree to which it is needed for the promotion of legitimate governmental interests. Lockett v. State, 747 N.E.2d 539, 542 (Ind. 2001). Put another way, the fundamental purpose of the Fourth Amendment "is to protect the legitimate expectations

9

of privacy that citizens possess in their persons, their homes, and their belongings." Taylor v. State, 842 N.E.2d 327, 330 (Ind. 2006).

We note that seizures conducted outside the judicial process, without prior approval by a judge or a magistrate, are per se unreasonable under the Fourth Amendment, subject only to a few specifically established and well-delineated exceptions, such as consent, exigent circumstances, and plain view. Warner v. State, 773 N.E.2d 239, 245 (Ind. 2002). Whether a particular warrantless seizure violates the guarantees of the Fourth Amendment depends upon the facts and circumstances of each case. Moore v. State, 827 N.E.2d 631, 638 (Ind. Ct. App. 2005). It is the State's burden to establish that the warrantless seizure fell within an exception to the warrant requirement. Id. A "seizure" of property occurs when there is some meaningful interference with an individual's possessory interests in that property. Id. When challenging a seizure, a defendant need only establish that the seizure interfered with his constitutionally protected possessory interests. George v. State, 901 N.E.2d 590, 596 (Ind. Ct. App. 2009).

In this case, Tuggle claims that Detective Hagan's action in seizing the bag of clothing at Hospital amounted to an illegal seizure. More particularly, Tuggle argues that Detective Hagan's removal of the clothing and transportation of them to a different location "were meaningful interference[s] with Tuggle's possessory interest in his own clothes." Appellant's App. p. 14. Moreover, Tuggle asserts that "admission to a hospital emergency room does not trigger the loss of constitutional protections." Id. at

10

15. In other words, Tuggle contends that he never surrendered his possessory rights in his belongings prior to their seizure and did not manifest the intent to abandon, relinquish control of, or discard his clothes. In short, Tuggle did not expect that "whoever [entered his hospital room could] just walk away with his belongings." Appellant's Br. p. 18. As a result, Tuggle asserts that his Fourth Amendment rights were violated when Detective Hagan seized his clothing without his consent or first securing a warrant. Thus, Tuggle argues that none of the exceptions to the warrant requirement applied in this instance.

Notwithstanding these contentions, we note that the evidence established that Tuggle arrived at Hospital claiming to be the victim of a shooting and an armed robbery. As noted above, Detective Hagan initially believed Tuggle's account about what occurred. Thus, Detective Hagan commenced an investigation and search for Tuggle's assailant. Naturally, the clothing that Tuggle was wearing at the time of the offense would be part of the evidence during the investigation. Tr. p. 27-28; 390. Indeed, Indiana Code section 35-47-7-1 requires hospitals to report "at once" any gunshot wounds to law enforcement.

Even more compelling, Detective Hagan had not yet searched or conducted any testing on the clothing when Tuggle became a suspect in the Lindsay shooting and, prior to any such search or forensic testing, law enforcement officials in fact obtained a search warrant. Id. at 48-49, 458-59, 461.

11

The State directs us to a case from the Fourth Circuit Court of Appeals that provides us with some guidance in this matter, where the plain view doctrine applied. The plain view doctrine justifies a warrantless seizure when 1) the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed; 2) the incriminating character of the evidence is immediately apparent; and 3) the officer has a lawful right of access to the object itself. Middleton v. State, 714 N.E.2d 1099, 1101 (Ind. 1999).

In United States v. Davis, the evidence showed that the defendant arrived at a hospital with a gunshot wound, claiming that he had been shot and robbed. 690 F.3d 226, 230 (4th Cir. 2012). In accordance with Maryland law, hospital personnel called the police, and an officer was dispatched. Id. The police officer found Davis in bed in the emergency room, conscious, and able to speak. Id. Davis's clothing had been removed by hospital personnel, placed in a bag, and stored underneath Davis's hospital bed. The police officer secured the bag as evidence of the reported shooting. The bag was then stored in the local police department's property room. Id. Four years later, a different police department was investigating Davis with regard to a murder and requested and obtained Davis's clothing without a warrant. Id. at 231. That police department then, again without a warrant, forensically tested Davis's clothing and created a DNA profile.

Davis argued that law enforcement personnel illegally seized his clothing from the hospital. Id. at 232-33. The Fourth Circuit determined that Davis's clothing was

12

properly seized under the plain view doctrine. Id. The court further explained that the police officer "was lawfully present in the hospital room, and he thus had lawful access in the ordinary course of his investigation to the bag of clothing which could be evidence against Davis's assailant." Id. at 234.

It was also determined that "the contents of [the] seized container [we]re a foregone conclusion." Id. (stating that "the circumstances under which the officer finds the container may add to the apparent nature of its contents"). In conclusion, the court reasoned that the clothing worn by a shooting victim "would be clear evidence a shooting occurred and might reasonably provide scientific evidence related to the gun caliber, distance, etc., is evidence of a crime and hence, has an immediately apparent incriminating nature." Id. at 237-38.

As were the circumstances in Davis, the State correctly contends here that there was no violation of Tuggle's Fourth Amendment rights and points out that Tuggle incorrectly asserts that the incriminating nature of the contents of the bag were "not readily apparent." Appellant's Br. p. 21-24. However, Tuggle ignores his own statements that he had been shot during an armed robbery. Moreover, Detective Hagan had no reason to doubt Tuggle's assertion that he was the victim of a shooting, even though Tuggle lied to him about the other consequences of the shooting. And because Detective Hagan knew that the bag contained the clothing that Tuggle was wearing at the time of his shooting, the bag invariably contained evidence of a crime. As in Davis, Detective Hagan would have had "little trouble . . . in concluding that [Tuggle's clothes]

13

would almost certainly contain both blood and a bullet hole, and would thus be incriminating evidence in the prosecution of the shooter." Id. at 235-36.

We also note that Tuggle has made no claim—and we have found no authority—suggesting that it is the alleged victim's "call" in deciding whether law enforcement officials may or may not be justified in seizing certain evidence that may likely be pertinent to the commission and investigation of a criminal offense. Even though Tuggle might retain a possessory interest in his clothing, that circumstance does not obviate a police officer's right to seize evidence of a crime. If it did, it might be likely that no evidence could ever be seized without a warrant.

The State also notes that Tuggle communicated to law enforcement personnel that he was a victim of a crime and did not express any objection to police officers removing his clothing from his presence. That said, because Detective Hagan knew that the bag contained the clothing Tuggle was wearing at the time of his shooting, the bag most likely contained evidence of a crime.

Finally, as noted above, law enforcement personnel showed restraint and neither searched nor tested Tuggle's clothing until a warrant was obtained to do so. Tr. p. 48-49, 458-59. As a result, we agree with the trial court that such incriminating evidence could be used against Tuggle at trial. Thus, there was no violation of Tuggle's Fourth Amendment rights, the bag of clothing was properly seized, and the DNA test results were properly admitted into evidence at trial.

14

## B. The Indiana Constitution

Tuggle also contends that Detective Hagan's seizure of Tuggle's clothing violated his rights under the Indiana Constitution. While Tuggle argues that he should prevail on Fourth Amendment principles, he further points out that "Hoosiers enjoy broader protection through Article I Section 11 of the Indiana Constitution," and that Detective Hagan's action was nothing more than an "indiscriminate seizure." Appellant's Br. p. 10, 24-26.

In accordance with Article I Section 11, the legality of a search or seizure depends on whether police conduct was reasonable under the totality of the circumstances. State v. Washington, 898 N.E.2d 1200, 1206 (Ind. 2008). The reasonableness of a search or seizure turns on a balance of: 1) the degree of concern, suspicion, or knowledge that a violation has occurred; 2) the degree of intrusion the method of the search or seizure imposes on the citizen's ordinary activities; and 3) the extent of law enforcement needs. Litchfield v. State, 824 N.E.2d 356, 359 (Ind. 2005). The State bears the burden to show that the intrusion was reasonable under the circumstances. Hathaway v. State, 906 N.E.2d 941, 945 (Ind. Ct. App. 2009).

Because Tuggle admitted that a crime had occurred that resulted in a gunshot wound, Tuggle maintains that the collection of his clothing was intrusive. However, it is undisputed that Tuggle lied to the police in asserting that he was only a victim. As a result, Detective Hagan certainly knew that a violation of the law had occurred. Also, the degree of intrusion was low. Tuggle was not wearing the clothing at the time it was

15

seized, and, considering that he had only been in the hospital for one day when the clothing was seized, Tuggle had no immediate use for the presumably blood-stained clothes. In other words, Detective Hagan's action in securing the clothes that he believed could be evidence in finding Tuggle's assailant imposed no intrusion on Tuggle's three-week recovery in the hospital.

Finally, it is apparent that the extent of law enforcement needs to investigate what was an obvious crime was high. Again, Tuggle admits that "a crime had occurred which resulted in his being shot." Appellant's Br. p. 25. The police certainly have a strong need to investigate criminal activity and prevent the perpetrators from robbing future individuals. In short, we can only conclude that Detective Hagan's act of securing the few pieces of evidence known to him at the time was eminently reasonable. Thus, we conclude that Tuggle has failed to show that his rights under Article I Section 11 of the Indiana Constitution were violated.

### III. Sufficiency of the Evidence

Tuggle also argues that the evidence was insufficient to support his conviction for murder. Specifically, Tuggle maintains that the evidence simply showed that he "was at the wrong place at the wrong time and his mere presence at the scene is insufficient to convict him of aiding in the murder." Appellant's Br. p. 11.

When challenging the sufficiency of the evidence to support a conviction, a reviewing court neither weighs the evidence nor judges the credibility of witnesses. McHenry v. State, 820 N.E.2d 124, 126 (Ind. 2005). Instead, we look to the evidence

16

most favorable to the trial court's verdict and reasonable inferences to be drawn therefrom. Id. A conviction will be affirmed unless "no rational fact-finder" could have found the defendant guilty beyond a reasonable doubt. Hampton v. State, 873 N.E.2d 1074, 1079 (Ind. Ct. App. 2007).

To convict Tuggle of murder as charged, the State was required to prove that Tuggle was an accomplice to the knowing or intentional killing of Lindsay. I.C. § 35-42-1-1(1). Additionally, Indiana Code section 35-41-2-4 provides that a person who knowingly or intentionally aids, induces, or causes another to commit an offense commits that offense himself. In determining whether there was sufficient evidence for purposes of accomplice liability, we consider such factors as: 1) presence at the scene of the crime; 2) companionship with another at the scene of the crime; 3) failure to oppose commission of the crime; and 4) course of conduct before, during, and after occurrence of the crime. Id. A defendant's mere presence at the crime scene, or lack of opposition to a crime, standing alone, is insufficient to establish accomplice liability. Tobar v. State, 740 N.E.2d 109, 112 (Ind. 2000). Flight shows consciousness of guilt. State v. Torphy, 217 Ind. 383, 387-88, 28 N.E.2d 70, 72 (1940).

These factors may be considered in conjunction with a defendant's course of conduct before, during, and after the crime, and a defendant's companionship with the one who commits the crime. Id. Furthermore, accomplice liability applies to the contemplated offense and all acts that are a probable and natural consequence of the concerted action. Wieland v. State, 736 N.E.2d 1198, 1202 (Ind. 2000). Moreover, an

17

accomplice is equally culpable as the one who commits the actual crime. Hauk v. State, 729 N.E.2d 994, 998 (Ind. 2000). Finally, it is not necessary for Tuggle to have participated in every element of the crime under a theory of accomplice liability. Bruno v. State, 774 N.E.2d 880, 882 (Ind. 2002).

In this case, the evidence established that Tuggle went with Torres to Lindsay's residence because they were always together and that he would "ride with him." Tr. p. 331, 547. Torres was armed and going to the residence with the express purpose of confronting Brady and/or Lindsay. Id. at 194-95, 226, 336, 546-47. Once Tuggle and Torres arrived at the residence, they entered the building, and Torres knocked on the front door. Id. at 193. While holding a gun, Torres threatened to shoot through the door. Id. at 195, 226-27. Lindsay then returned home and entered the building. Tuggle, by his own admission, became involved in a fight with Lindsay. Id. at 553, 555, 557. During the fight, Lindsay was shot three times. Torres and Tuggle then calmly left the scene of the shooting. Id. at 247, 250, 253.

Although Tuggle was shot, he lied to the police about his involvement in the incident with regard to Lindsay. Tr. p. 561, 564, 566. Finally, Lindsay's blood was found on Tuggle's jeans, shirt, socks, and shoes. Id. at 520-24. From this evidence, the jury could reasonably infer that Tuggle went to Lindsay's residence, fought with him, and assisted Torres in shooting him.

In other words, Tuggle's arguments to the contrary—that he was merely present at the scene and did not participate in Lindsay's murder—amount to impermissible

18

requests to reweigh the evidence, which we will not do.  Joslyn v. State, 942 N.E.2d 809, 811 (Ind. 2011).

The judgment of the trial court is affirmed.

BARNES, J., and CRONE, J., concur.