# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jun 11 2019, 8:42 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Stephenie K. Gookins
Cate, Terry & Gookins LLC
Carmel, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Matthew B. MacKenzie
Deputy Attorney General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

Levon E. Coleman,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

June 11, 2019

Court of Appeals Case No.
18A-CR-2784

Appeal from the Hamilton
Superior Court

The Honorable J. Richard
Campbell, Judge

Trial Court Cause No.
29D04-1512-F6-10158

**Robb, Judge.**

# Case Summary and Issues

[1] Following a jury trial, Levon Coleman was convicted of three counts of fraud, all Level 6 felonies. Coleman appeals his convictions, raising two issues for our review: (1) whether the trial court abused its discretion when it denied Coleman's motion for a mistrial; and (2) whether the evidence sufficiently supports Coleman's fraud convictions. Concluding the trial court did not abuse its discretion and the evidence was sufficient to prove Coleman committed the offenses, we affirm.

# Facts and Procedural History

[2] On August 11, 2015, Stephen Nason, a loss prevention specialist at the Hobart Best Buy, received a phone call from Thomas Garcia, one of the store's employees who was working that day. Garcia informed Nason of "a problem with a credit card transaction in the computer department and asked if [Nason] could come over and take a look." Transcript of Evidence, Volume 2 at 72. Garcia described the nature of the problem to Nason. The credit card transaction for computer equipment totaling $1,800 or $1,900 had been declined and required an authorization code but the customer, Shaquita Jones, "insisted on using a pre-obtained authorization number." *Id.* at 73. As is typical store policy in these instances, Nason instructed Garcia to ask the customer for another form of payment and told Garcia he would assist.

[3] Nason walked to the register where he encountered Jones and Coleman. Nason requested another form of payment but Jones insisted on using the declined card, stating she already spoke with her bank and had an approval code. Jones' name and "netSpend Debit Visa" were printed on her card, ending in 5731. Appellant's Appendix, Volume 2 at 22. Nason asked Jones to swipe her card a second time so he could call the bank for authorization.[1] Jones swiped the card and "call for authorization" appeared on the register screen. Tr., Vol. 2 at 88. When Nason stated he could call the bank for authorization, Jones handed him a "post-it with a number on it[,]" told him she had "already gotten an authorization code from her bank[,]" and the bank had instructed her to use "this code." *Id*. at 78.

[4] Suspicious because a bank would not provide an authorization code to a customer ahead of time without having the transaction available, Nason asked Jones to see the card. Jones handed Nason the card, he examined it and recognized several suspicious physical features: the numbers were worn and

---

[1] Nason explained the authorization process at trial:

> [S]ometimes on large purchases, when a customer is using a credit card, if it's an unusually large amount for the person's account, sometimes either the bank or our system will flag it and our computer will stop the transaction and say, please call bank for authorization. So, from there the associate is supposed to call the bank [and] the associate explains over the phone to the operator what the situation is, the dollar amount of the sale, confirms [the customer's] identity, then they would hand the phone over to the customer. The customer would prove their ident[ity] and then the operator on the phone, if they approve the sale, they would give us an authorization number or they would just decline the sale and then we would apologize.

Tr., Vol. 2 at 77.

appeared to be "artificially embossed"; the spacing was different; and the plastic appeared to be stretched. *Id.* at 79. Nason also performed a bank identification number ("BIN") search by checking the first six digits of the card, which indicate the bank or financial company that issued the card. The search revealed that the BIN belonged to Nordstrom and was associated with a Nordstrom credit card rather than a "netSpend Debit Visa." Appellant's App., Volume 2 at 22. While Nason inspected the card and performed the BIN search, Jones sat at a computer desk and Coleman stood nearby.

[5] Suspecting the card was fraudulent, Nason intended to step behind the customer service area to discretely call the police for assistance. Nason informed Jones and Coleman that he was going to step away to call the bank to obtain an authorization code himself but assured them that he would come right back. When Nason stepped away from the register, Coleman followed him briefly, and then walked back and spoke with Jones. While Nason was on the phone with the police department in the customer service area, Coleman came around the front of the desk, approached Nason, and began shouting, "give me her card back, give me it back." Tr., Vol. 2 at 90. After Nason refused to return the card, Coleman told Jones they should go, and then he exited the store and got into a white van.

[6] Nason provided the police with a description of the van and its location. Jones asked Nason "what was going on" and he told her the police were on their way and he had identified the incident as fraud. *Id.* at 91. Jones left the store and Nason went outside "to keep an eye on her[.]" *Id.* Officer Kenneth Williams

of the Hobart Police Department ("HPD") arrived on the scene where a Best Buy employee pointed out the van that Nason described to police, which, at this point in time, was headed toward Route 30. Officer Williams located the van Coleman was driving and initiated a traffic stop. After discovering Coleman was driving with a suspended license, Officer Williams wrote him a ticket, requested a tow truck to impound the van per HPD policy, and began an inventory of the vehicle. Coleman was placed under arrest at the scene of the traffic stop and Jones was arrested in front of the store.

[7] After obtaining a search warrant the following day, HPD officers searched the van and discovered various electronic items, including a TV, multiple tablets, a MacBook Pro, prepaid T-Mobile and Verizon cards, and other merchandise. Three credit cards were also located in the cupholder of the van, one in Jones' name and two containing the name Stephanie Brown. HPD Detective Nicholas Wardrip contacted Nason and provided him with the serial numbers for the electronic items recovered from the van and numbers of the re-encoded credit cards. At Detective Wardrip's request, Nason ran the serial numbers for the electronic items through Best Buy's "electronic journal," allowing him to obtain duplicate receipts from other Best Buy stores. *Id*. at 93. Nason was able to match several purchases made on August 11 in Marion and Hamilton Counties to the items recovered from the van. *See id*. at 126. Nason's review revealed that at 12:11 p.m., the same day Nason encountered Jones and Coleman in his store, the two had purchased $2,065.07 worth of merchandise from the Carmel Best Buy, with a credit card ending in 6167. Later that day, at

4:26 p.m. and 4:46 p.m., Jones and Coleman used a credit card ending in 5731 to purchase $1,527.73 and then $1,818.99 worth of items at the Noblesville store. Nason also obtained video surveillance from each store and verified that the customers present for the transactions were the "same two subjects that were in [Nason's] store on August 11 at around 8:00 p.m.[,]" namely Jones and Coleman. Tr., Vol. 2 at 96; *see also* Appellant's App., Vol. 2 at 25.

[8]    Detective Wardrip's investigation revealed that the two credit cards used in these transactions were Nordstrom credit cards linked to other individuals. He contacted Nordstrom and spoke with an investigator who provided information on the re-encoded cards. Specifically, the card ending in 6167 was linked to Eileen Kent of Alexandria, Virginia, and had an unauthorized transaction for $2,065.07 from the Carmel Best Buy on August 11, 2015. Similarly, the card ending in 5731 was linked to Jane Martin of Edgewater, Maryland, and had unauthorized transactions for $1,527.73 and $1,818.99 from the Noblesville Best Buy on August 11, 2015. Appellant's App., Vol. 2 at 25. Detective Wardrip also learned that if a transaction was marked as "forced," as these were, it indicated the use of a fraudulent authorization code provided by the customer at the time of the transaction and entered by the store employee. *Id.*

[9]    On December 1, 2015, the State charged Coleman with three counts of fraud and three counts of forgery, all Level 6 felonies, for the transactions at the Noblesville and Carmel Best Buy stores. A jury trial was held on September 13, 2018. After the State rested, Coleman moved for a directed verdict on the forgery counts, which the trial court granted, leaving the jury to determine the

three fraud counts. *See* Tr., Vol. 2 at 146. Following closing arguments and final instructions, which included an instruction on accomplice liability, the jury retired to the jury room for deliberation. At that time, the court reporter became aware that an exhibit admitted at trial, specifically State's Exhibit 13, was missing and confirmed that Detective Wardrip had mistakenly taken the exhibit with him when he returned to Hobart. The exhibit was a plastic bag containing the three credit cards recovered from the van Coleman was driving, one in Jones' name and the other two with Stephanie Brown's name. At the start of deliberations, the jury had asked to see the exhibit. The trial court asked the parties for solutions or suggestions on how to proceed and the defense proposed that the court recess until the next morning to allow the exhibit to be returned. The trial court asked if the State would be willing to withdraw the exhibit and have the jury instructed not to consider the exhibit, to which the State agreed. Defense counsel objected, concerned the proposed solution would create confusion for the jury, and moved for a mistrial, which the trial court denied. The parties continued to discuss the issue:

> The Court:   I'm not going to declare – we'll either proceed – we'll proceed with a stipulation what names were on the card or proceed with withdrawing the exhibits and admonishing [the jury not] to consider that exhibit as evidence. . . .
>
> * * *
>
> [Defense]:   I guess. Over objection, Judge, I guess [Exhibit 13] could be withdrawn. Over objection.

*Id*. at 187. The trial court ordered the jury to return from its deliberations and then proceeded to admonish them as follows:

> [W]e no longer have State's Exhibit 13. You will not have Exhibit 13 to examine in the jury room. You were given a chance to look at it during the trial. However, since it cannot be located now, the State has withdrawn Exhibit 13. The Court is withdrawing Exhibit 13 from the evidence in this case. What that means [is] that you must not consider the evidence in making a decision. You have to treat it as if you never saw Exhibit 13. It's not to be considered as part of your decision because of the exhibit that's missing. So, this has never happened before, but this is the best way, I think, we need to proceed. . . . It's my decision to proceed this way without Exhibit 13. . . . Any questions from the jury? If not? Yes?

*Id*. at 188. Two jurors then asked for clarification that Exhibit 13 was the bag with the three credit cards that had been examined by the jury during the trial. The jury returned to the jury room to continue deliberating and ultimately, found Coleman guilty of all three fraud counts (Counts 1, 3, and 5). The trial court sentenced Coleman to 730 days executed at the Indiana Department of Correction on each count, to be served concurrently. Coleman now appeals, challenging the trial court's denial of his motion for a mistrial and the sufficiency of the evidence supporting his fraud convictions. Additional facts will be provided as necessary.

# Discussion and Decision

# I. Denial of Motion for Mistrial

Coleman first challenges the trial court's denial of his motion for a mistrial after the parties discovered that State's Exhibit 13 was missing and unavailable for the jury to examine during its deliberations.

"A mistrial is an extreme remedy that is warranted only when less severe remedies will not satisfactorily correct the error." *Warren v. State*, 725 N.E.2d 828, 833 (Ind. 2000). A trial court is in the best position to evaluate whether a mistrial is warranted "because it can assess first-hand all relevant facts and circumstances and their impact on the jury." *Ramirez v. State*, 7 N.E.3d 933, 935 (Ind. 2014). Accordingly, we afford its decision great deference and review the trial court's decision for an abuse of discretion. *Gregory v. State*, 540 N.E.2d 585, 589 (Ind. 1989). An abuse of discretion occurs when the trial court's decision is clearly against the logic and effect of the facts and circumstances before it. *Vaughn v. State*, 971 N.E.2d 63, 68 (Ind. 2012).

The denial of a motion for mistrial will be reversed only upon a showing that the defendant was placed in a position of grave peril to which he should not have been subjected. *Myers v. State*, 887 N.E.2d 170, 189 (Ind. Ct. App. 2008), *trans. denied*. On appeal, the defendant bears the burden of demonstrating he was placed in grave peril by the denial of the motion, as well as the additional burden of demonstrating that no other action could have remedied the perilous situation into which he was placed. *Id*. "The gravity of the peril is determined by the probable and persuasive effect [of the conduct] on the jury's decision[,]"

*Bisard v. State*, 26 N.E.3d 1060, 1068 (Ind. Ct. App. 2015), *trans. denied*, rather than the degree of impropriety of the conduct, *Gregory*, 540 N.E.2d at 589.

> When faced with a circumstance that a defendant believes might warrant mistrial, generally, the correct procedure is to request an admonishment. However, if counsel is not satisfied with the admonishment or it is obvious that the admonishment will not be sufficient to cure the error, counsel may then move for a mistrial. A failure to request an admonishment or move for a mistrial results in waiver of the issue.

*Cherry v. State*, 971 N.E.2d 726, 733 (Ind. Ct. App. 2012) (citations omitted), *trans. denied*. Furthermore, a "timely and accurate admonition is presumed to cure any error in the admission of evidence." *Randolph v. State*, 755 N.E.2d 572, 575 (Ind. 2001) (quoting *Heavrin v. State*, 675 N.E.2d 1075, 1084 (Ind. 1996)).

[13] First, we address the issue of waiver. Here, the State argues that Coleman waived appellate review of his motion for a mistrial because he failed to object after the trial court admonished the jury and he ultimately acquiesced to the trial court's decision to withdraw the exhibit and admonish the jury. The record clearly shows that after discovering State's Exhibit 13 was missing, defense counsel suggested that the court recess until the following morning, but instead the trial court asked if the State would be willing to withdraw the exhibit and instruct the jury not to consider the exhibit. The State agreed. At that point, defense counsel objected and moved for a mistrial. The trial court denied Coleman's motion and explained it would proceed with either a

stipulation as to which names were on the credit cards *or* withdraw the exhibit and admonish the jury not to consider it in making their determination. Defense counsel stated, "I guess. Over objection, Judge, I guess [Exhibit 13] could be withdrawn. Over objection." Tr., Vol. 2 at 187. Then, the trial court ordered the jury back into the courtroom, explained that the exhibit had been withdrawn, and admonished them not to consider it as evidence. The trial court stated, in part, "you must not consider [the exhibit] in making a decision. You have to treat it as if you never saw Exhibit 13. It's not to be considered as part of your decision because of the exhibit that's missing." *Id*. at 188. After the admonishment, defense counsel again raised concern the solution would lead to jury confusion and the trial court allowed defense counsel to make his record to preserve the issue. We cannot conclude Coleman waived appellate review of his motion for a mistrial.

[14] Coleman's argument that he was placed in a position of grave peril to which he should not have been subjected fails, however. Specifically, Coleman contends that the "entire theme of his case" was predicated upon a lack of evidence of his knowledge that a crime was being committed. Appellant's Brief at 9. In support of his argument, he emphasizes that Jones was the one who interacted with the store employees and pleaded guilty to similar charges, and that his name was not on any of the credit cards in evidence, including the three credit cards labeled as State's Exhibit 13. As a result, he contends that the trial court's suggestion that the exhibit be withdrawn and the State's willingness to withdraw the exhibit "deprived [him] the opportunity to potentially argue and

present his case in a different manner as a result of [Jones'] credit cards not being included in evidence." *Id*. at 10. With respect to its effect on the jury, Coleman asserts that because the jury requested to see the exhibit at the start of their deliberations, "they placed significant importance on that exhibit and it was material to their determination of guilt." *Id*. at 14. However, we fail to see how the withdrawal of the exhibit had a "probable and persuasive effect on the jury's decision[,]" placing Coleman in a position of grave peril when the three credit cards in State's Exhibit 13 were not used in the fraudulent transactions that occurred at the Carmel and Noblesville stores, of which Coleman was convicted. *Bisard*, 26 N.E.3d at 1068. Given the ample evidence supporting Coleman's convictions that he was a willing participant in a scheme to commit fraud, as discussed below, we are unpersuaded by Coleman's argument that the withdrawal of the exhibit placed him in a position of grave peril. Thus, the trial court did not abuse its discretion by denying Coleman's motion for a mistrial.

## II. Sufficiency of the Evidence

[15] Coleman also argues the evidence was insufficient to support his convictions. Specifically, he contends there is no evidence that he actually used the credit cards in question or that he had any connection to Jones, who *did* use the credit cards. The State, however, argues that the evidence reveals that Coleman and Jones engaged in a scheme to fraudulently obtain merchandise: they "proceeded to several different Best Buy stores; purchased large amounts of electronics with two falsified credit cards; and . . . when [Coleman] realized

Nason would discover their scheme by calling the bank, he fled the store." Brief of Appellee at 16.

[16] When reviewing the sufficiency of the evidence to support a conviction, we do not reweigh the evidence or judge the credibility of the witnesses. *McHenry v. State*, 820 N.E.2d 124, 126 (Ind. 2005). We consider only the probative evidence and reasonable inferences supporting the verdict. *Drane v. State*, 867 N.E.2d 144, 146 (Ind. 2007). When confronted with conflicting evidence, we must consider it "most favorably to the trial court's ruling" and the evidence need not overcome every reasonable hypothesis of innocence. *Id.* "We will affirm if there is substantial evidence of probative value such that a reasonable trier of fact could have concluded the defendant was guilty beyond a reasonable doubt." *Bailey v. State*, 907 N.E.2d 1003, 1005 (Ind. 2009).

[17] A person who, with the intent to defraud, obtains property by using a credit card, knowing that the credit card is forged commits fraud, a Level 6 felony. Ind. Code § 35-43-5-4(1)(B). Under Indiana's accomplice liability statute, a person "who knowingly or intentionally aids, induces, or causes another person to commit an offense commits that offense[.]" Ind. Code § 35-41-2-4. And the statute governing accomplice liability "does not establish it as a separate crime, but merely as a separate basis of liability for the crime charged." *Hampton v. State*, 719 N.E.2d 803, 807 (Ind. 1999). Thus, an accomplice is equally culpable as the principal, the one who commits the actual crime. *Tuggle v. State*, 9 N.E.3d 726, 736 (Ind. Ct. App. 2014), *trans. denied*.

[18]    In determining whether the evidence is sufficient to demonstrate accomplice liability, we consider the defendant's: (1) presence at the crime scene; (2) companionship with another at the crime scene; (3) failure to oppose the commission of the crime; and (4) course of conduct before, during, and after the commission of the crime. *Griffin v. State*, 16 N.E.3d 997, 1004 (Ind. Ct. App. 2014). A defendant's mere presence at the crime scene or lack of opposition to a crime, alone, is insufficient to establish accomplice liability. *Tuggle*, 9 N.E.3d at 736. However, these factors may be considered in conjunction with a defendant's course of conduct before, during, and after the crime, and his or her companionship with the principal. *Id*. Here, the State prosecuted Coleman under the accomplice liability theory and the jury was provided with instructions accordingly. *See* Tr., Vol. 2 at 170-71.

[19]    Viewing the evidence most favorable to the verdicts, the State presented video clips from Best Buy's surveillance system at trial and Nason walked the jury through the video, which illustrated that on August 11, 2015 at 7:55 p.m., Jones and Coleman entered the Hobart Best Buy together. Nason identified Jones, who had a "purple burgundy shirt on, [and] long curly hair[,]" and Coleman, with the "long green sweater and a baseball cap." Tr., Vol. 2 at 86. Garcia was shown assisting the two and Nason walked over to assist. Jones swiped the credit card again at Nason's request and then handed it to Nason when authorization was requested. When Nason stepped away to call the police, Coleman briefly followed him, and then walked back over to Jones. Coleman then walked over to the customer service desk and began shouting at Nason to

give him the card back. Coleman exited the store at 8:18 p.m. and Jones exited four minutes later. Nason testified that Jones was wearing a maroon shirt with "Pink" on it and Coleman wore a long-sleeve green sweater. *Id*. at 74. Photos of the two, which accurately represented these descriptions, were admitted at trial. *See* Table of Exhibits, Volume 3 at 5-8.

[20] Nason testified that HPD asked him to produce receipts from other Best Buy stores and his inquiry revealed three transactions on August 11, 2015: a $2,065.07 transaction at 12:11 p.m. using a credit card ending in 6167 at the Carmel Best Buy, and a $1,527.73 transaction at 4:26 p.m. and a $1,818.99 transaction at 4:46 p.m. using a credit card ending in 5731 at the Noblesville Best Buy. Receipts reflecting the store, date, time, items purchased, total amount, and last four digits of the credit card were admitted at trial. *See* Table of Exhibits, Vol. 3 at 14-18. The credit card ending in 5731, which was used at the Noblesville store and given to Nason at the Hobart store, was also admitted. *See id*. at 10. Nason testified that, upon finding these transactions and receipts, he "contacted those stores and spoke with asset protection associates . . . and asked them to review their video tape on those dates and times and send [him] screen shots and video clips of the customers that were present for those transactions." Tr., Vol. 2 at 96. After receiving the requested videos, Nason stated, "I was able to verify that it was the same two subjects that were in [the Hobart] store on August 11 at around 8:00 p.m." *Id*. Surveillance videos depicting Jones and Coleman at the Hobart, Carmel, and Noblesville stores were presented to the jury. In addition, video clips showing the two in the

Lafayette Road store and the 82nd Street store around 12:48 p.m. and 1:42 p.m. that day were shown to the jury.

[21] Coleman was physically present with Jones during the transactions and it is clear the two had some level of companionship. At a minimum, the evidence supports a reasonable inference that the two were driving from one Best Buy to the next in Central Indiana, purchasing similar items, making large transactions, and working together to fraudulently obtain merchandise. There is no evidence that Coleman opposed the crimes, but instead the two continued to drive from store to store until Nason discovered their scheme.

[22] Finally, Coleman's conduct before, during, and after each transaction and during the attempted transaction at the Hobart store illustrates a clear scheme between the two. The evidence demonstrates that the two entered the stores together and both were present during the transactions. In fact, the evidence shows that Coleman carried a television out of the Carmel store alongside Jones and a bag of merchandise out of the Noblesville store. We also acknowledge that a defendant's "[f]light shows consciousness of guilt." *Tuggle*, 9 N.E.3d at 736. The evidence is clear that when Nason became suspicious of the two, Coleman followed Nason briefly, said something to Jones, and approached the customer service desk where he yelled at Nason to give the credit card back. However, when Nason did not comply, Coleman fled the store, got into the van and drove away – the van from which officers later recovered thousands of dollars' worth of Best Buy merchandise that Nason was able to link to fraudulent purchases.

[23] Based on the surveillance videos and store receipts, Nason identified Coleman and Jones as the customers present during the fraudulent transactions in the Carmel and Noblesville stores. Given the totality of the evidence, there was substantial evidence of probative value such that a reasonable jury could have concluded Coleman was a willing participant in a scheme with Jones to fraudulently obtain merchandise. See *Sandleben v. State*, 22 N.E.3d 782, 791 (Ind. Ct. App. 2014) (intent may be proven by circumstantial evidence and inferred from a defendant's conduct, as well as the "natural and usual sequence to which such conduct logically and reasonably points [and t]he fact finder is entitled to infer intent from the surrounding circumstances"), *trans. denied*.

# Conclusion

[24] Based on the foregoing, we conclude the trial court did not abuse its discretion when it denied Coleman's motion for a mistrial and the evidence was sufficient evidence to support his fraud convictions. We therefore affirm Coleman's convictions.

[25] Affirmed.

Baker, J., and Najam, J., concur.