Paul A. MOORE, Appellant–Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 49A02–0405–CR–436.

Court of Appeals of Indiana.

May 23, 2005.

Rehearing Denied Aug. 12, 2005.

Hilary Bowe Ricks, Indianapolis, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, George P. Sherman, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

CRONE, Judge.

### Case Summary

Paul A. Moore appeals his convictions and sentence for two counts of murder, two counts of class B felony criminal confinement, and one count of class B felony arson. We affirm.

### Issues

We restate Moore's three issues as follows:

I. Whether the trial court committed reversible error in admitting ballistics evidence derived from the warrantless seizure of a handgun;

II. Whether his convictions are supported by sufficient evidence; and

III. Whether the trial court properly sentenced him.

## Facts and Procedural History

The facts most favorable to the convictions indicate that Moore's mother purchased a .45–caliber Ruger handgun in 2001 and kept it at Moore's home in the 4300 block of East 39th Street in Indianapolis. On the afternoon of January 25, 2002, Indianapolis Police Department Sergeant David Wisneski responded to a report of a burglary in progress at the home of Linda Jordan. Sergeant Wisneski heard the yelling of gang names and saw an unidentified person push Linda aside and forcibly enter her home. Yonic Jordan then forcibly removed someone from the home. After the situation calmed down, Sergeant Wisneski learned that Derrick Dempsey had lost a fight with Yonic and had driven to the Jordan residence with Moore and a third person "to seek revenge." Tr. at 593. Sergeant Wisneski asked Dempsey if he could "look inside" his car, which was parked in the driveway with the engine running. *Id.* at 579. Dempsey consented.

In the trunk, Sergeant Wisneski found an assault rifle and a shotgun. A records check indicated that Moore had reported these firearms stolen. Under the front passenger seat, Sergeant Wisneski found a "chrome and black" .45–caliber · Ruger handgun, which had not been reported stolen. *Id.* at 583. Moore stated that he owned the handgun and produced a valid handgun permit. Sergeant Wisneski made no arrests but confiscated the firearms "because things were in a very, very dangerous state at that time[.]" *Id.* at 594. Sergeant Wisneski sent the firearms to the police property room. On January 28, 2002, as part of his duties in operating the Integrated Ballistic Identification System ("IBIS"), firearms technician John Brooks test-fired the confiscated handgun and entered the relevant ballistics information into the IBIS computer.[1] In April 2002, Moore's mother retrieved the handgun from the property room and gave it to Moore.

Late one night in June 2003, Moore telephoned Eric Bettis, the uncle of his friend Curtis Ward, and asked for a ride. Eric complied, and Moore gave him $30. The next morning, Moore informed Eric that he had left his gun in the car. Eric's wife, Theresa, stopped by Moore's residence to give him the gun, but he was not at home. Theresa gave the gun to Eric's brother, Herman Bettis, because she did not want to keep it in her car. Herman informed Moore that he had the "[b]lack and silver" .45–caliber handgun, and Moore told him to "hang on to it[.]" *Id.* at 705, 706. Herman kept the handgun in his restaurant.

On the evening of Friday, July 18, 2003, Adrian Beverly was riding around with Brandie Coleman and Gregory Johnson, who was dressed as a female and went by the name of Nireah. The trio saw Moore and Ward riding in Moore's car and asked them to pull into a gas station parking lot. Johnson and Moore exited their vehicles, talked briefly, and exchanged phone numbers. Johnson hugged Moore and kissed him on the cheek. *Id.* at 798. Moore was attracted to Johnson. *Id.* at 799. Coleman and Ward also exchanged phone numbers.

---

**1.** At trial, Brooks explained, "The criteria we have for the IBIS system is to put in [confiscated] firearms of specific calibers that are commonly used and test firing these are picked up on a daily basis during the working week, test-fired and then the bullets and cartridge casings are placed in the system." Tr. at 607. He further stated that IBIS is "a computerized system to help aid in investigations to link recovered firearms evidence at locations to weapons or other shootings." *Id.* at 608. Brooks testified that Moore's handgun did not have a magazine when he received it for test-firing. *Id.* at 613.

On July 21, 2003, Herman Bettis delivered the handgun to Moore at his home. At 12:51 a.m. on July 23, 2003, Coleman called Moore's home phone to speak with Ward. Coleman and Johnson then drove to Moore's home in Coleman's mother's Jeep Grand Cherokee. Coleman, Johnson, Ward, and Moore chatted briefly outside and entered Moore's home. Ward and Coleman went into Ward's room, and Moore and Johnson went into Moore's room.

Later, Moore entered Ward's room with a "[b]lack and gray" Ruger .45–caliber handgun and said, "Man, I need to holler at you." *Id.* at 456, 454. The two men went into the kitchen, and Moore asked Ward whether he knew "if Nireah is a man or a female." *Id.* at 455. Ward told the "[d]isturbed" and "upset" Moore that Nireah looked like a woman to him. *Id.* Moore and Ward went into the living room, where Moore "interrogat[ed]" Johnson and Coleman regarding whether Johnson was male or female. *Id.* at 456. After approximately forty minutes of questioning, Johnson had to use the restroom. Moore followed him there and exclaimed in a "stunned, startled" voice, "Man, this is a boy." *Id.* at 457. Moore became "real irate" and talked about feeling "like his manhood's been violated[.]" *Id.* Moore stated that Johnson "was kissing on him." *Id.* at 457. Moore stated that he should "[w]hip [their] ass" or "possibly kill them[.]" *Id.* at 458. Moore asked Johnson, "What did you think, I was a faggot?" *Id.*

Moore asked Ward to get some wire, which they used to bind Coleman's and Johnson's hands behind their backs. Johnson sobbed that he "didn't mean nothing" and would "never do nothing like that again" and "turn straight." *Id.* at 459. Moore put Coleman and Johnson in the backseat of the Jeep and told Ward to follow him in Ward's car. Moore drove the Jeep from East 39th Street to a small park on Fall Creek Parkway North Drive, where he drove over a curb, around a locked gate, and into a wooded cul-de-sac. Ward drove past the gate, made a U-turn, and returned to see Moore walking up the road. Moore entered Ward's car, took the handgun out of his pocket, dismantled it, and threw the pieces out the window. Moore said, "Man, I had to do it." *Id.* at 463. Moore told Ward that he had to "calm [Coleman] down" after he shot Johnson. *Id.* at 464. The pair went back to Moore's home, returned a roto-rooter to a rental store, and went their separate ways.

That afternoon, Moore called Ward and stated that "he might have to go back and burn the truck up." *Id.* at 467. Ward later spoke with Moore's brother, Clarence McGee, who had seen the bodies in the Jeep. McGee asked Ward to pick him up at Moore's home so that "they could go burn the Jeep up." *Id.* at 468. Ward arrived at Moore's home after dark. Moore told Ward that the Jeep had to be burned to "cover his tracks." *Id.* at 469. McGee asked Ward to get a gas can, and the two men drove back to the Jeep. Ward let McGee out of the car near the Jeep, made a U-turn, and retrieved McGee, who smelled of gasoline and said that he had almost burnt himself. Ward saw that the Jeep was in flames. Upon their return, Moore described how Johnson "flopped back in the seat" when he was shot. *Id.* at 472. Moore told Ward that he was like a brother and that "if anything goes down that [they] wouldn't have anything to worry about." *Id.* at 472–73.

Just after 9:00 p.m., firefighters were dispatched to the burning Jeep and extinguished the flames. Inside, they discovered the charred bodies of Johnson and Coleman, both of whom had been fatally shot in the forehead before the fire start-

ed. Coleman's larynx and chest had suffered blunt force trauma. The .45–caliber bullets recovered from the victims' skulls matched the January 2002 ballistics test of Moore's handgun. Investigators determined that gasoline had been poured in the backseat of the Jeep and ignited. On July 29, 2003, Adrian Beverly identified Ward as the passenger in the car that she had seen in the gas station parking lot on July 18 while riding with Coleman and Johnson. Ward initially denied any involvement in the crimes but eventually implicated Moore.[2]

On August 5, 2003, the State charged Moore with two counts of murder, two counts of class B felony criminal confinement, and one count of class B felony arson. Moore and McGee were tried together in April 2004.[3] On April 8, 2004, the jury found Moore guilty as charged. On May 5, 2004, the trial court imposed an aggregate sentence of 120 years. Moore now appeals.

2. At the time of the murders, Ward was on probation for carrying a handgun without a license. Ward blamed McGee for the handgun charge because he had "brought [Ward's] gun out of the house," and Ward "took the blame for it." Tr. at 485. Ward was taken into custody and charged with violating his probation, and his bond was reduced from $250,000 to $15,000. *Id.* at 498. Ward was released on bond in October 2003. *Id.* At the time of Moore's trial, Ward had been charged with but not yet prosecuted for class B felony criminal confinement, class B felony arson, and class C felony assisting a criminal. *Id.* at 485.

3. The jury found McGee guilty of arson, assisting a criminal, and obstruction of justice. The trial court entered judgment of conviction and sentenced McGee only on the first two counts because of double jeopardy concerns. McGee appealed his convictions. Recently, another panel of this court affirmed McGee's arson conviction and vacated his conviction for assisting a criminal on double jeopardy grounds. *See McGee v. State,* 822 N.E.2d 1132 (Ind.Ct.App., 2005), *trans. denied.*

## Discussion and Decision

### I. Admissibility of Ballistics Evidence

"To generally deter police from violating people's Fourth Amendment rights, the [United States] Supreme Court created the exclusionary rule, which prohibits the admission of evidence seized in violation of the Fourth Amendment." *Caudle v. State,* 754 N.E.2d 33, 34 (Ind.Ct.App.2001), *opinion on reh'g, trans. denied.* Moore contends that Sergeant Wisneski's warrantless confiscation of his handgun in January 2002 "was not justified by probable cause" and violated his right to be free from unreasonable seizures under the Fourth Amendment to the United States Constitution. Appellant's Br. at 13.[4] Moore characterizes the subsequent test-firing of the handgun as an unconstitutional search and contends that the trial court committed reversible error in admitting ballistics evidence obtained as a result of the seizure and test-firing of the handgun.[5]

McGee and Moore have the same appellate counsel. We direct counsel's attention to Indiana Appellate Rule 15(C)(4)(c), which provides that an appellant's case summary shall include information regarding "[r]elated appeals (prior, pending or potential) known to the party[.]" Moore's case summary does not mention the appeal of his codefendant, McGee.

4. Moore asserts for the first time on appeal that "[i]f an [apparently] unloaded handgun can be confiscated simply because it might cause harm, then the entire Second Amendment to the United States Constitution is meaningless." Appellant's Br. at 12 (emphasis and footnote omitted); *see* U.S. CONST. amend. II ("A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."). We need not address that assertion here.

5. Moore also challenges the admissibility of the ballistics evidence under Article 1, Section 11 of the Indiana Constitution. Because we decide the issue on Fourth Amendment

The State does not attempt to rebut Moore's constitutional argument. We have stated that

[a]n appellee's failure to respond to an issue raised by an appellant is akin to failure to file a brief. This circumstance does not, however, relieve us of our obligation to decide the law as applied to the facts in the record in order to determine whether reversal is required. Controverting arguments advanced for reversal is still an obligation which properly remains with counsel for the appellee. Therefore, [the appellant] need only establish that the lower court committed prima facie error to win reversal on this issue. Prima facie means at first sight, on first appearance, or on the face of it. As this court said in *Gardner v. State*, 591 N.E.2d 592 (Ind.Ct.App.1992):

The prima facie standard thus prevents two evils which would otherwise undermine the judicial process. First, by requiring the appellant to show some error, we ensure that the court, not the parties, decides the law. Second, by allowing the appellant to prevail upon a showing simply of prima facie error, we avoid the improper burden of having to act as advocate for the absent appellee.

*Id.* at 593.

*Newman v. State*, 719 N.E.2d 832, 838 (Ind.Ct.App.1999) (some citations omitted), *trans. denied* (2000).

■ The Fourth Amendment provides, "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."[6] The Fourth Amendment protects citizens against unreasonable searches and seizures of persons and property by requiring a warrant based on probable cause. *McReynolds v. State*, 460 N.E.2d 960, 962 (Ind.1984). Probable cause exists when an officer has knowledge of facts and circumstances that would lead a reasonably prudent person to believe that a crime has been committed. *See Gibson v. State*, 518 N.E.2d 1132, 1136 (Ind.Ct.App.1988), *trans. denied.*

■ "It is axiomatic that warrants, both search and arrest, are required unless probable cause exists along with exigent circumstances rendering it impractical to seek a warrant." *Jones v. State*, 409 N.E.2d 1254, 1257 (Ind.Ct.App.1980). Exigent circumstances may include danger to law enforcement officers or the risk of loss or destruction of evidence. *See Zimmerman v. State*, 469 N.E.2d 11, 16 (Ind.Ct.App.1984). Absent probable cause, however, exigent circumstances alone are insufficient to justify a warrantless seizure. *Cf. Harless v. State*, 577 N.E.2d 245, 248 (noting same with respect to warrantless search: "[E]xigent circumstances justify dispensing with the search warrant, but do

grounds, we need not address his Indiana constitutional claim.

**6.** At trial, Moore acknowledged that he had no basis for challenging Sergeant Wisneski's warrantless search of Derrick Dempsey's vehicle, in which the handgun was found. *See, e.g., Mays v. State*, 719 N.E.2d 1263, 1266 (Ind.Ct.App.1999) ("Fourth Amendment rights are personal and may not be vicariously asserted. The definition of those rights is more properly placed within the purview of substantive Fourth Amendment law than within that of standing. Thus, in order to claim the protection of the Fourth Amendment, a defendant must demonstrate that he personally has an expectation of privacy in the place searched and that his expectation is reasonable.") (citations omitted), *trans. denied* (2000).

not eliminate the need for probable cause."); *Jones*, 409 N.E.2d at 1258 ("A search without probable cause is never justified by the need to prevent the disappearance or destruction of evidence of a crime."). Whether a particular warrantless seizure violates the guarantees of the Fourth Amendment depends upon the facts and circumstances of each case. *State v. Joe*, 693 N.E.2d 573, 575 (Ind.Ct. App.1998), *trans. denied*. "The State bears the burden of proving that the warrantless seizure fell within an exception to the warrant requirement." *Id.*[7]

■ Here, Sergeant Wisneski testified that he confiscated Moore's handgun because he "believed that the crime of criminal gang activity had or may have taken place" and because "things were in a very, very dangerous state at that time, and . . . there needed to be [a minimum] of cooling off because, you know, anybody that would go get weapons and take them to someone's house to seek revenge, that's a danger." Tr. at 594. Sergeant Wisneski candidly admitted, however, that he "wasn't sure of the elements of criminal gang activity at the time[,]" *id.*, and Moore points out that the handgun "was not seized as evidence of any crime, not even the 'gang activity' that Wisneski thought might be afoot."[8] Appellant's Br. at 11. In other words, Sergeant Wisneski did not have probable cause to seize the handgun, for which Moore had a valid permit. *Cf. Cochran v. State*, 429 N.E.2d 672, 674 (Ind.Ct. App.1981) (discussing seizure of property under "plain view" doctrine:[9] "[A]n officer

place where items are in plain view, (2) the incriminating nature of the objects in plain view must be immediately apparent, and (3) the officer must have a lawful right to access the items in plain view."). A traditional application of the plain view doctrine would be problematic in this case, given that Moore may not challenge the constitutionality of Sergeant Wisneski's search of Dempsey's vehicle, in which the handgun was not in plain view. Even though Sergeant Wisneski did not violate Moore's Fourth Amendment rights in searching Dempsey's vehicle, we note that any basis for suspecting that the handgun was "incriminating" evaporated once he determined that it had not been reported stolen and that Moore had a valid handgun permit. We do not mean to suggest that police officers should not make every reasonable effort to ensure their safety and the safety of others in similar situations, but we do emphasize that all searches and seizures must comport with the Fourth Amendment for evidence to be admissible at trial. *Cf.* Ind.Code § 35–33–1–1.5 (providing that a law enforcement officer "responding to the scene of an alleged crime involving domestic or family violence shall use all reasonable means to prevent further violence," including the confiscation and removal of "a firearm, ammunition, or a deadly weapon from the scene if the law enforcement officer has: (1) *probable cause* to believe that a crime involving domestic or family violence

---

7. The State does not contend that Moore consented to Sergeant Wisneski's seizure of the handgun and the subsequent test-firing of the handgun.

8. In *Trice v. State*, 693 N.E.2d 649 (Ind.Ct. App.1998), we explained that

> [i]n order to convict a defendant of criminal gang activity, the State must prove beyond a reasonable doubt that the individual (1) is an active member of a group with *five* or more members which[ ] promotes, sponsors, assists in, or participates in or requires as a condition of membership or continued membership the commission of a felony or an act that would be a felony if committed by an adult or a battery, (2) has knowledge of the group's criminal advocacy, and (3) has a specific intent to further the group's criminal goals.

*Id.* at 651 (citing Ind.Code §§ 35–45–9–1, –3) (emphasis added). It would appear that Sergeant Wisneski's probable cause determination, if any, was based solely on the yelling of gang names by unidentified persons during the fracas at Linda Jordan's home, at which Moore and two acquaintances were present.

9. *See Hannibal v. State*, 804 N.E.2d 206, 210 (Ind.Ct.App.2004) ("To justify a warrantless seizure under the plain view doctrine, a law enforcement officer (1) must not have violated the Fourth Amendment in arriving at the

must have probable cause to believe that the property to be seized is connected to criminal activity."). As such, the warrantless seizure violated the Fourth Amendment.[10]

▮▮▮ We need not specifically determine whether the subsequent test-firing of the handgun was a search for purposes of the Fourth Amendment, because the ballistics evidence was clearly derived from the unconstitutional seizure and thus should have been excluded as "fruit of the poisonous tree."

> The "fruit of the poisonous tree" doctrine is one facet of the exclusionary rule of evidence which bars the admissibility in a criminal proceeding of evidence obtained in the course of unlawful searches and seizures. When applied, the doctrine operates to bar not only evidence directly obtained, but also evidence derivatively gained as a result of information learned or leads obtained during an unlawful search or seizure. To invoke the doctrine, a defendant must show that challenged evidence was obtained by the State in violation of the defendant's Fourth Amendment rights.

*Hanna v. State,* 726 N.E.2d 384, 389 (Ind. Ct.App.2000) (citations omitted). Moore has made that showing here. We therefore conclude that the trial court erred in admitting the ballistics evidence.

▮▮▮ The State contends that the error was harmless. We agree.

> Admissions of evidence in violation of the Fourth Amendment are subject to harmless error analysis. Harmless error occurs when the conviction is supported by substantial independent evidence of guilt which satisfies the reviewing court that there is no likelihood that the erroneously admitted evidence contributed to the conviction. Violations of the Fourth Amendment must be harmless beyond a reasonable doubt. We must find that there is no substantial likelihood the error contributed to the verdict, or, in other words, that the error was unimportant in relation to everything else before the jury on the issue in question.

*Smock v. State,* 766 N.E.2d 401, 407 (Ind. Ct.App.2002) (citations omitted).

At trial, Moore testified that he last saw the handgun "a little bit before" his home

---

has occurred; (2) a *reasonable belief* that the firearm, ammunition, or deadly weapon: (A) exposes the victim to an *immediate risk of serious bodily injury;* or (B) was an *instrumentality of the crime* involving domestic or family violence; and (3) *observed* the firearm, ammunition, or deadly weapon at the scene during the response.") (emphases added). If any such items are removed from the scene, the officer must provide for their "safe storage ... during the pendency of a proceeding related to the alleged act of domestic or family violence." *Id.*

10. Recently, the General Assembly passed legislation regarding the seizure of firearms from "dangerous" persons. *See* House Enrolled Act 1776 (defining "dangerous" in relevant part under Ind.Code § 35–47–13–1 as "a person presents an imminent risk of personal injury to the person or to another person").

Pursuant to this legislation, a law enforcement officer who conducts a warrantless seizure of a firearm from a person the officer believes to be dangerous must submit to the court a sworn statement describing the basis for that belief. *Id.* (Ind.Code § 35–47–13–3(a)). From this statement, the court must determine whether probable cause exists to believe that the person is dangerous. *Id.* (Ind.Code § 35–47–13–3(b)). If the court finds the person to be dangerous, then it shall order that the law enforcement agency retain the firearm pending a hearing; if the court finds the person not to be dangerous, then it shall order that the firearm be returned to the person. *Id.* (Ind.Code §§ 35–47–13–3(b), –5). Indiana Code Section 35–47–13–3(c) provides, "This section does not authorize a law enforcement officer to perform a warrantless search or seizure if a warrant would otherwise be required." *Id.*

was allegedly burglarized in August 2002, and although he admitted to meeting and being kissed by Johnson several days before his murder, he denied any involvement in the charged crimes. Tr. at 789. The State points out that if the jury had believed Moore's testimony, "the ballistics test from his gun would have been irrelevant. For if the gun had been stolen and was in another person's possession in July of 2003, Moore obviously could not be guilty of the murders." Appellee's Br. at 9. The ballistics evidence was not inconsistent with Moore's claim of innocence, nor did it establish ipso facto that Moore used the handgun to kill Coleman and Johnson. The jury chose to believe Ward's and the Bettises' testimony that Moore possessed the handgun at the time of the murders, and thus the ballistics evidence was merely cumulative of the evidence establishing that Moore committed the murders. As discussed more fully below, this evidence is sufficiently substantial that we must conclude that the trial court's error in admitting the ballistics evidence was harmless beyond a reasonable doubt. *See Fuller v. State*, 674 N.E.2d 576, 578 (Ind.Ct.App. 1996) ("It is well recognized that any error in admitting evidence will be found harmless where the evidence is merely cumulative. This proposition also applies where the alleged error is of a constitutional nature.") (citation omitted).

## II. Sufficiency of Evidence

Moore challenges the sufficiency of the evidence supporting his convictions. Our standard of review is well settled:

When reviewing a sufficiency of the evidence claim, we consider only the evidence most favorable to the judgment and all reasonable inferences to be drawn from that evidence. We neither reweigh the evidence nor judge the credibility of the witnesses. We will

affirm a conviction upon finding substantial evidence of probative value from which the jury could find the defendant guilty beyond a reasonable doubt.

*Green v. State*, 756 N.E.2d 496, 497 (Ind. 2001). "The testimony of a single eyewitness to a crime is sufficient to sustain a murder conviction." *Id.*

Moore disparages Ward's testimony regarding the crimes, characterizing it as "incredibly dubious." Appellant's Br. at 23. "For testimony to be so inherently incredible that it is disregarded based on a finding of 'incredible dubiosity,' the witness must present testimony that is inherently contradictory, wholly equivocal or the result of coercion, and there must also be a complete lack of circumstantial evidence of the defendant's guilt." *Clay v. State*, 755 N.E.2d 187, 189 (Ind.2001). We note that

[a]pplication of this rule is rare; the standard to be applied is whether the testimony is so incredibly dubious or inherently improbable that no reasonable person could believe it.

The testimony of an accomplice is subject to high scrutiny. However, such testimony is by itself sufficient to sustain a conviction. The fact that the accomplice may not be completely trustworthy goes to the weight and credibility of his testimony, something that is completely within the province of the jury and cannot be reviewed on appeal.

*Herron v. State*, 808 N.E.2d 172, 176 (Ind. Ct.App.2004) (citations omitted), *trans. denied.*

The "incredible dubiosity" rule is inapplicable here. Moore points to Ward's initial denial of involvement in the crimes, his incentive to implicate Moore and receive favorable treatment from the State, and minor inconsistencies between his testimony and other evidence in the record, but these do not render his testimony inher-

ently improbable such that no reasonable person could believe it. These inconsistencies "were factual issues for the jury to resolve." *Miller v. State*, 770 N.E.2d 763, 775 (Ind.2002). Ward's account of the crimes was neither inherently contradictory nor equivocal, and there is no indication that it was the result of coercion. The jury found Ward to be a credible witness, and we may not disturb that determination. We conclude that the State presented sufficient evidence from which a jury could find Moore guilty beyond a reasonable doubt.

### III. Sentencing

The trial court sentenced Moore as follows:

As to mitigating circumstances the Court is going to find that the Defendant has a minimal criminal history, he only has one prior arrest and that was for a misdemeanor possession of marijuana, so the Court believes that is certainly a mitigating circumstance. The Court will also find as mitigating the fact that imprisonment would impose a hardship against his dependents, I believe that he has one child that's approximately one year old. As to aggravating circumstances, this Court finds that the nature and the circumstances of the crime committed was uniquely aggravating in this matter, this Court heard evidence and the jury found the Defendant guilty based on evidence that Mr. Gregory Johnson had dressed as a female and that this Defendant became upset when he realized this. Both victims, Ms. Coleman and Mr. Johnson,

were then bound with wire, were taken to a remote spot, where I think the terms that were used during the course of the trial, they were "executed." This Court also finds it unique that both of ... these victims were not shot in typical execution style in the back of the head. They were shot in the front of the head, so that both victims were able to observe their last fleeting moments as Mr. Moore pulled the trigger. Following that the car was burned beyond recognition. As stated before there were two victims, obviously Mr. Johnson was killed because he was different, that appears to be the only reason and it's certainly sad to realize that Ms. Brandie Coleman was killed for basically being with another individual who was different. And all of those circumstances make this a very unique homicide, which is hard for this Court to say, no homicide's unique, but this one certainly had unique characteristics. The Court has carefully weighed the aggravating circumstances against the mitigating circumstance and this Court believes the aggravator in this case outweighs the mitigator. As to Count One, murder, the Defendant will be sentenced to fifty-five years, the presumptive term.[11] As to Count Two, [murder,] fifty-five years, the presumptive term. Count One and Count Two will be served consecutively. As to Count Three, [class B felony criminal confinement,] Defendant will be sentenced to [the presumptive term of] ten years.[12] As to Count Four, [class B felony criminal confinement,] the Defen-

---

11. *See* Ind.Code § 35–50–2–3 ("A person who commits murder shall be imprisoned for a fixed term of fifty-five (55) years, with not more than ten (10) years added for aggravating circumstances or not more than ten (10) years subtracted for mitigating circumstances[.]").

12. *See* Ind.Code § 35–50–2–5 ("A person who commits a Class B felony shall be imprisoned for a fixed term of ten (10) years, with not more than ten (10) years added for aggravating circumstances or not more than four (4) years subtracted for mitigating circumstances[.]").

dant will be sentenced to ten years, those will run concurrent with each other, as well as concurrent with Counts One and Two. As to Count Five, the [class B felony] arson, the Defendant will be sentenced to ten years, that will be ordered to be served consecutive to Count One and Two. Total sentence will be a hundred and twenty years for Mr. Paul Moore.

Tr. at 1119–21.

Moore contends that the trial court failed to give sufficient weight to his minimal criminal history as a mitigating circumstance and violated his Sixth Amendment right to trial by jury, as stated in *Blakely v. Washington*, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), by imposing consecutive sentences based on an aggravating circumstance not found by the jury beyond a reasonable doubt.[13] Moore also challenges the appropriateness of his sentence under Indiana Appellate Rule 7(B). We address each contention in turn.

Our supreme court has explained that

[i]n order to impose consecutive sentences, a trial court must find at least one aggravating circumstance. When a trial court imposes consecutive sentences, when not required to do so by statute, [we] will examine the record to insure that the trial court explained its reasons for selecting the sentence imposed. The trial court's statement of reasons must include: (1) the identification of all significant aggravating and mitigating circumstances; (2) the specific facts and reasons that lead the

court to find the existence of each such circumstance; and (3) an articulation demonstrating that the mitigating and aggravating circumstances have been evaluated and balanced in determining the sentence.

*Ortiz v. State*, 766 N.E.2d 370, 377 (Ind. 2002) (citations omitted). With respect to Moore's first contention, we note that "[a] finding of mitigating circumstances, like sentencing decisions in general, lies within the trial court's discretion[,]" and that the court "is not required to give the same weight or credit to mitigating evidence as does the defendant." *Wilkie v. State*, 813 N.E.2d 794, 799 (Ind.Ct.App.2004), *trans. denied.* Moore cites *Loveless v. State*, 642 N.E.2d 974 (Ind.1994), for the premise that a lack of prior criminal convictions is "a strong mitigating factor." Appellant's Br. at 28. We observe that the defendant in *Loveless* apparently had no criminal record whatsoever, but in any event, we cannot conclude that Moore's minimal criminal history outweighs the "uniquely aggravating" nature and circumstances of his crimes as detailed by the trial court in its sentencing statement. We find no abuse of discretion.

As for Moore's Sixth Amendment argument, our supreme court recently held that "[t]here is no constitutional problem with consecutive sentencing so long as the trial court does not exceed the combined statutory maximums" as defined in *Blakely*—in this case, fifty-five years for the murder convictions and ten years for the class B felony convictions. *Smylie v. State*, 823 N.E.2d 679, 686 (Ind.2005). There is no constitutional problem here.

---

13. Moore also suggests that the trial court was required to "clarify why the particular sentences were being run consecutively[,]" but he cites no authority for this proposition. Appellant's Br. at 29. "It is well established that a party's failure to provide proper cita-

tion to authority results in waiver." *Bartley v. State*, 800 N.E.2d 193, 196 (Ind.Ct.App.2003). Consequently, we do not address this argument. We also note that Moore mentions the Sixth Amendment for the first time in his reply brief.

Finally, Moore asks us to revise his sentence pursuant to Appellate Rule 7(B), contending that it is "inappropriate in light of the nature of the offense and the character of the offender." Ind. Appellate Rule 7(B). We acknowledge Moore's minimal criminal history, but given his cold-blooded execution and subsequent burning of the victims, we cannot conclude that his 120–year sentence is inappropriate.

Affirmed.

RILEY, J., and ROBB, J., concur.