## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jan 28 2015, 9:51 am

*Kevin S. Smith*

**CLERK**

of the supreme court, court of appeals and tax court

ATTORNEY FOR APPELLANT

Joel M. Schumm

Rory Gallagher
Certified Legal Intern
Appellate Clinic
Indiana University
Robert H. McKinney School of Law
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Eric P. Babbs
Deputy Attorney General of Indiana
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| T.M., <br> *Appellant-Respondent,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Petitioner* | January 28, 2015 <br><br> Court of Appeals Cause No. 49A02-1405-JV-362 <br><br> Appeal from the Marion Superior Court <br> The Honorable Marilyn A. Moores, Judge <br> The Honorable Geoffrey Gaither, Magistrate <br> Cause No. 49D09-1402-JD-393 |

**Crone, Judge.**

## Case Summary

[1]     T.M. appeals his adjudication as a delinquent for committing an act that would

constitute class B felony robbery with a deadly weapon if committed by an

adult. He contends that the victim's testimony is incredibly dubious, and therefore the evidence is insufficient to support the true finding. Given that the victim was not the sole witness testifying to T.M.'s guilt, we conclude that the incredible dubiosity rule is inapplicable and affirm T.M.'s delinquency adjudication.

## Facts and Procedural History

[2] The facts most favorable to the true finding are as follows. In February 2012, around 7:00 p.m., sixteen-year-old C.C. was walking to an Indianapolis store to meet his nineteen-year-old brother Austin. It was dark. C.C. was listening to music on his cell phone, and three boys approached him. One boy was wearing a red jacket with the hood pulled over his head. He pointed a gun at C.C. and told him that he would shoot C.C. if C.C. did not hand over his phone. C.C. did not know who this boy was, but he found out later. Tr. at 5. The gun was black with a silver rod that C.C. could see through an opening at the top. The police later told C.C. that it was a BB gun. Another boy wearing a grey and black jacket with the hood pulled over his head knocked C.C.'s cell phone out of his hand, and it fell to the ground. The boy wearing the red jacket picked it up, and the three boys ran away.

[3] C.C. met Austin. Austin saw that C.C. was teary eyed, so he asked him what happened. C.C. told him what happened and that one of the boys was wearing a red jacket. Austin and C.C. walked around looking for someone with a red jacket.

[4] About fifteen to twenty minutes after the robbery, Austin and C.C. saw six or seven boys in an alley about three and a half blocks from where the robbery had occurred. None of the boys in the alley was wearing a red jacket.

[5] Austin went up to the boys to talk to them "to see what was going on." *Id*. at 30. C.C. did not approach the boys, but remained where they could probably not see him. *Id*. at 20. C.C. recognized two of the boys because he had seen them in the neighborhood before. *Id*. at 8. C.C. recognized T.M., who went by the name "Buddy." *Id*. at 9. C.C. was friends with T.M.'s sister and had seen T.M. four or five times. C.C. did not know the name of the other boy he recognized. That boy was later identified as I.D.

[6] The group of boys told Austin that they did not know what was going on with the phone and did not have it. Austin tried to call C.C.'s phone and thought that he heard it ring. T.M. privately told Austin that he had been involved in the robbery, but he did not say that he pulled the gun. *Id*. at 30-31. Austin asked T.M. if anyone else was involved, but T.M. would not tell him. Austin searched T.M. but did not find the phone or a gun. Austin had never seen T.M. or I.D. before. At some point, C.C. told Austin that T.M. looked like the boy who had pointed the gun at him, but "he wasn't for sure" and "he didn't think that Buddy would do it, because … they were friends." *Id*. at 35.

[7] Austin told the boys that they had to return the phone or the police would be called. The boys led Austin to a house purportedly to recover the phone. Austin searched the house but did not find the phone.

[8] C.C.'s mother called the police. They came to the house where C.C. and Austin were and identified everyone that was there. The police created a lineup of ten to twelve people, including Austin and four other people that C.C. knew. *Id.* at 12. C.C. identified T.M. and I.D. as two of the perpetrators, but did not identify the third. The phone was never recovered.

[9] The juvenile court found probable cause to approve the filing of a delinquency petition against T.M. alleging that he was a delinquent child for committing an act constituting a class B felony robbery with a deadly weapon if committed by an adult. A factfinding hearing was held for T.M. and his codefendant I.D. C.C. and Austin testified. T.M. submitted the probable cause affidavit filed against him, which stated that a BB gun had been recovered from I.D.'s yard. T.M.'s Ex. A. The probable cause affidavit also stated that the BB gun was depicted in two Facebook photographs of I.D. and two other boys. I.D. submitted the two Facebook photographs. I.D.'s Ex. A. C.C. testified that the BB gun in the Facebook photos was the same gun that T.M. had pointed at him. The BB gun was not submitted. The trial court entered a true finding against T.M. and placed him on probation with a suspended commitment to the Indiana Department of Correction. T.M. appeals.

## Discussion and Decision

[10] Our standard of review for claims of insufficient evidence with respect to juvenile delinquency adjudications is well settled:

> We neither reweigh the evidence nor judge the credibility of witnesses. The State must prove beyond a reasonable doubt that the juvenile

committed the charged offense. We examine only the evidence most favorable to the judgment along with all reasonable inferences to be drawn therefrom. We will affirm if there exists substantive evidence of probative value to establish every material element of the offense. Further, it is the function of the trier of fact to resolve conflicts in testimony and to determine the weight of the evidence and the credibility of the witnesses.

*K.D. v. State*, 754 N.E.2d 36, 38-39 (Ind. Ct. App. 2001) (citations omitted).

[11] To sustain a true finding that T.M. committed class B felony robbery, the State was required to prove beyond a reasonable doubt that he knowingly or intentionally took property from another person by using or threating the use of force on any person or putting any person in fear while armed with a deadly weapon. Ind. Code § 35-42-5-1. T.M. argues that C.C.'s identification of him as one of the assailants is incredibly dubious and is therefore insufficient as a matter of law. Generally, appellate courts do not judge witness credibility, but we may apply the "incredible dubiosity" rule to impinge upon the factfinder's function to judge witness credibility. *Fajardo v. State*, 859 N.E.2d 1201, 1208 (Ind. 2007). Under the incredible dubiosity rule,

> [i]f a sole witness presents inherently improbable testimony and there is a complete lack of circumstantial evidence, a defendant's conviction may be reversed. This is appropriate only where the court has confronted inherently improbable testimony or coerced, equivocal, wholly uncorroborated testimony of incredible dubiosity. Application of this rule is rare and the standard to be applied is whether the testimony is so incredibly dubious or inherently improbable that no reasonable person could believe it.

[12] *Love v. State*, 761 N.E.2d 806, 810 (Ind. 2002).

The fact that the sole witness gives inconsistent testimony does not render such testimony incredibly dubious. *See Fonner v. State*, 876 N.E.2d 340, 343 (Ind. Ct. App. 2007) (concluding that officer's testimony contained inconsistencies but was not incredibly dubious); *see also Moore v. State*, 827 N.E.2d 631, 640-41 (Ind. Ct. App. 2005) (stating that minor inconsistencies did not render sole witness's testimony incredibly dubious but rather went to its weight and that was a matter for factfinder), *trans. denied*. "The incredible dubiosity rule applies only when a witness contradicts himself in a single statement or while testifying, not to conflicts between multiple statements." *Glenn v. State*, 884 N.E.2d 347, 356 (Ind. Ct. App. 2008), *trans. denied*; *see also Buckner v. State*, 857 N.E.2d 1011, 1018 (Ind. Ct. App. 2006) ("The incredible dubiosity rule applies to conflicts in trial testimony rather than conflicts that exist between trial testimony and statements made to the police before trial.").

T.M. argues that we should apply the incredible dubiosity rule because C.C.'s testimony was equivocal and appears to have been coerced by his older brother's self-help investigation into the robbery. However, C.C. was not the only witness to testify to T.M.'s identity as one of the assailants. Austin testified that T.M. told him that he was involved in the robbery. Thus, there is independent evidence of T.M.'s guilt such that the incredible dubiosity rule is inapplicable. *See Cox v. State*, 780 N.E.2d 1150, 1154 (Ind. Ct. App. 2002) (declining to address Cox's incredible dubiosity claim because more than one witness testified as to events surrounding crime).

[15] Nevertheless, T.M. argues that Austin's testimony should not bar the application of the incredible dubiosity rule because Austin is his older brother and was the primary source of coercion. Whether the incredible dubiosity rule should be extended to situations involving more than one witness is a question that we may leave for another day because we cannot agree with T.M. that the record establishes that C.C. was coerced by Austin. *Cf. Gaddis v. State*, 253 Ind. 73, 77-82, 251 N.E.2d 658, 660-62 (1969) (sole witness testified that he was threatened with prison if he did not testify against Gaddis and his testimony regarding his identification of Gaddis as assailant was vacillating, contradictory, and uncertain and therefore incredibly dubious). Accordingly, we affirm T.M.'s delinquency adjudication.

[16] Affirmed.

Friedlander, J., and Kirsch, J., concur.