## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED
May 13 2015, 9:57 am
CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANT

Susan D. Rayl
Michael R. Smith
Smith Rayl Law Offices
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

George P. Sherman
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Paul A. Moore, *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, *Appellee-Plaintiff.* | May 13, 2015 <br><br> Court of Appeals Case No. 49A02-1407-PC-475 <br><br> Appeal from the Marion Superior Court <br><br> The Honorable Marc T. Rothenberg, Judge <br><br> The Honorable Amy J. Barbar, Magistrate <br><br> Cause No. 49G02-0308-PC-128884 |

**Najam, Judge.**

# Statement of the Case

Paul A. Moore appeals the denial of his petition for post-conviction relief, which challenged his convictions for two counts of murder, two counts of criminal confinement, as Class B felonies, and one count of arson, as a Class B felony, for which he received an aggregate sentence of 120 years. Moore presents the following two consolidated and restated issues for our review:

1. Whether he is entitled to post-conviction relief because he established that the prosecutor withheld evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and then suborned perjury related to the non-disclosure; and

2. Whether he was denied the effective assistance of trial counsel for failure to call an exculpatory witness.

We affirm.

# Facts and Procedural History

We recited the facts relevant to Moore's convictions in his direct appeal:

> The facts most favorable to the convictions indicate that Moore's mother purchased a .45-caliber Ruger handgun in 2001 and kept it at Moore's home in the 4300 block of East 39th Street in Indianapolis. On the afternoon of January 25, 2002, Indianapolis Police Department Sergeant David Wisneski responded to a report of a burglary in progress at the home of Linda Jordan. Sergeant Wisneski heard the yelling of gang names and saw an unidentified person push Linda aside and forcibly enter her home. Yonic Jordan then forcibly removed someone from the home. After the situation calmed down, Sergeant Wisneski learned that Derrick Dempsey had lost a fight

with Yonic and had driven to the Jordan residence with Moore and a third person "to seek revenge." Tr. at 593. Sergeant Wisneski asked Dempsey if he could "look inside" his car, which was parked in the driveway with the engine running. *Id.* at 579. Dempsey consented.

In the trunk, Sergeant Wisneski found an assault rifle and a shotgun. A records check indicated that Moore had reported these firearms stolen. Under the front passenger seat, Sergeant Wisneski found a "chrome and black" .45-caliber Ruger handgun, which had not been reported stolen. *Id.* at 583. Moore stated that he owned the handgun and produced a valid handgun permit. Sergeant Wisneski made no arrests but confiscated the firearms "because things were in a very, very dangerous state at that time[.]" *Id.* at 594. Sergeant Wisneski sent the firearms to the police property room. On January 28, 2002, as part of his duties in operating the Integrated Ballistic Identification System ("IBIS"), firearms technician John Brooks test-fired the confiscated handgun and entered the relevant ballistics information into the IBIS computer. In April 2002, Moore's mother retrieved the handgun from the property room and gave it to Moore.

Late one night in June 2003, Moore telephoned Eric Bettis, the uncle of his friend Curtis Ward, and asked for a ride. Eric complied, and Moore gave him $30. The next morning, Moore informed Eric that he had left his gun in the car. Eric's wife, Theresa, stopped by Moore's residence to give him the gun, but he was not at home. Theresa gave the gun to Eric's brother, Herman Bettis, because she did not want to keep it in her car. Herman informed Moore that he had the "[b]lack and silver" .45-caliber handgun, and Moore told him to "hang on to it[.]" *Id.* at 705, 706. Herman kept the handgun in his restaurant.

On the evening of Friday, July 18, 2003, Adrian Beverly was riding around with Brandie Coleman and Gregory Johnson, who was dressed as a female and went by the name of Nireah. The

trio saw Moore and Ward riding in Moore's car and asked them to pull into a gas station parking lot. Johnson and Moore exited their vehicles, talked briefly, and exchanged phone numbers. Johnson hugged Moore and kissed him on the cheek. *Id.* at 798. Moore was attracted to Johnson. *Id.* at 799. Coleman and Ward also exchanged phone numbers.

On July 21, 2003, Herman Bettis delivered the handgun to Moore at his home. At 12:51 a.m. on July 23, 2003, Coleman called Moore's home phone to speak with Ward. Coleman and Johnson then drove to Moore's home in Coleman's mother's Jeep Grand Cherokee. Coleman, Johnson, Ward, and Moore chatted briefly outside and entered Moore's home. Ward and Coleman went into Ward's room, and Moore and Johnson went into Moore's room.

Later, Moore entered Ward's room with a "[b]lack and gray" Ruger .45-caliber handgun and said, "Man, I need to holler at you." *Id.* at 456, 454. The two men went into the kitchen, and Moore asked Ward whether he knew "if Nireah is a man or a female." *Id.* at 455. Ward told the "[d]isturbed" and "upset" Moore that Nireah looked like a woman to him. *Id.* Moore and Ward went into the living room, where Moore "interrogat[ed]" Johnson and Coleman regarding whether Johnson was male or female. *Id.* at 456. After approximately forty minutes of questioning, Johnson had to use the restroom. Moore followed him there and exclaimed in a "stunned, startled" voice, "Man, this is a boy." *Id.* at 457. Moore became "real irate" and talked about feeling "like his manhood's been violated[.]" *Id.* Moore stated that Johnson "was kissing on him." *Id*. at 457. Moore stated that he should "[w]hip [their] ass" or "possibly kill them[.]" *Id.* at 458. Moore asked Johnson, "What did you think, I was a faggot?" *Id.*

Moore asked Ward to get some wire, which they used to bind Coleman's and Johnson's hands behind their backs. Johnson sobbed that he "didn't mean nothing" and would "never do

nothing like that again" and "turn straight." *Id.* at 459. Moore put Coleman and Johnson in the backseat of the Jeep and told Ward to follow him in Ward's car. Moore drove the Jeep from East 39th Street to a small park on Fall Creek Parkway North Drive, where he drove over a curb, around a locked gate, and into a wooded cul-de-sac. Ward drove past the gate, made a U-turn, and returned to see Moore walking up the road. Moore entered Ward's car, took the handgun out of his pocket, dismantled it, and threw the pieces out the window. Moore said, "Man, I had to do it." *Id.* at 463. Moore told Ward that he had to "calm [Coleman] down" after he shot Johnson. *Id.* at 464. The pair went back to Moore's home, returned a roto-rooter to a rental store, and went their separate ways.

That afternoon, Moore called Ward and stated that "he might have to go back and burn the truck up." *Id.* at 467. Ward later spoke with Moore's brother, Clarence McGee, who had seen the bodies in the Jeep. McGee asked Ward to pick him up at Moore's home so that "they could go burn the Jeep up." *Id.* at 468. Ward arrived at Moore's home after dark. Moore told Ward that the Jeep had to be burned to "cover his tracks." *Id.* at 469. McGee asked Ward to get a gas can, and the two men drove back to the Jeep. Ward let McGee out of the car near the Jeep, made a U-turn, and retrieved McGee, who smelled of gasoline and said that he had almost burn[ed] himself. Ward saw that the Jeep was in flames. Upon their return, Moore described how Johnson "flopped back in the seat" when he was shot. *Id*. at 472. Moore told Ward that he was like a brother and that "if anything goes down that [they] wouldn't have anything to worry about." *Id*. at 472-73.

Just after 9:00 p.m., firefighters were dispatched to the burning Jeep and extinguished the flames. Inside, they discovered the charred bodies of Johnson and Coleman, both of whom had been fatally shot in the forehead before the fire started. Coleman's larynx and chest had suffered blunt force trauma. The .45-caliber bullets recovered from the victims' skulls matched the January

2002 ballistics test of Moore's handgun. Investigators determined that gasoline had been poured in the backseat of the Jeep and ignited. On July 29, 2003, Adrian Beverly identified Ward as the passenger in the car that she had seen in the gas station parking lot on July 18 while riding with Coleman and Johnson. Ward initially denied any involvement in the crimes but eventually implicated Moore.

On August 5, 2003, the State charged Moore with two counts of murder, two counts of class B felony criminal confinement, and one count of class B felony arson. Moore and McGee were tried together in April 2004. On April 8, 2004, the jury found Moore guilty as charged. On May 5, 2004, the trial court imposed an aggregate sentence of 120 years.

*Moore v. State*, 827 N.E.2d 631, 633-36 (Ind. Ct. App. 2005), *trans. denied*.

[4] On direct appeal, Moore challenged the admission of ballistics evidence, the sufficiency of the evidence to support his convictions, and his sentence. *Id.* at 633. This court determined that the ballistics evidence was derived from an unconstitutional seizure of the handgun and should have been excluded as fruit of the poisonous tree. *Id.* at 639. However, the ballistics evidence was found to be cumulative of Ward's and the Bettises' testimony that Moore possessed the handgun at the time of the murders. *Id.* at 640. Accordingly, the error in the admission of the ballistics evidence was harmless beyond a reasonable doubt. *Id.* Additionally, this Court concluded that the State presented sufficient evidence to support Moore's convictions and that his sentence was not inappropriate. *Id.* at 641, 643. Thus, we affirmed Moore's convictions and sentence.

On October 4, 2006, Moore filed a petition for post-conviction relief, which he amended on May 3, 2013. Moore's amended petition for post-conviction relief asserted the following grounds for relief:

> The State committed a *Brady* violation, in direct contravention of the Fourteenth Amendment of the United States Constitution and Article One, Sections Twelve and Thirteen of the Indiana Constitution, where the State failed to disclose the existence of an informal agreement/understanding between itself and [a] key witness.
>
> The State committed prosecutorial misconduct . . . where the State knowingly allowed the presentation of perjured testimony of their key witness.
>
> Petitioner received ineffective assistance of trial counsel . . . where counsel failed to call the only exculpatory witness who would have corroborated the defense's theory.

Appellant's App. at 141-42. On August 21, 2013, and on November 6, 2013, the post-conviction court conducted evidentiary hearings at which Ward, Marcel Pratt (Moore's trial counsel), Ralph Staples (the prosecuting attorney), and Moore's grandfather (the omitted defense witness) testified. On June 17, 2014, the post-conviction court entered its findings of fact and conclusions of law in which it denied Moore's petition for post-conviction relief. This appeal ensued.

# Discussion and Decision

## *Post-Conviction Standard of Review*

The petitioner in a post-conviction proceeding bears the burden of establishing the grounds for relief by a preponderance of the evidence. Ind. Post-Conviction Rule 1(5); *Fisher v. State*, 810 N.E.2d 674, 679 (Ind. 2004). When appealing from the denial of post-conviction relief, the petitioner stands in the position of one appealing from a negative judgment. *Id.* On review, we will not reverse the judgment of the post-conviction court unless the evidence as a whole unerringly and unmistakably leads to a conclusion opposite that reached by the post-conviction court. *Id.* A post-conviction court's findings and judgment will be reversed only upon a showing of clear error, that which leaves us with a definite and firm conviction that a mistake has been made. *Id.* In this review, findings of fact are accepted unless they are clearly erroneous and no deference is accorded to conclusions of law. *Id.* The post-conviction court is the sole judge of the weight of the evidence and the credibility of witnesses. *Id.*

## *Alleged Exculpatory Evidence*—**Brady** *Claim*

Moore first contends that he is entitled to a new trial because the State failed to turn over exculpatory evidence, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). His petition for post-conviction relief alleged that the State failed to disclose the existence of an informal agreement between the State and Ward, something he now describes as a "wink and nod" or "unspoken" agreement. Appellant's Br. at 8.

[8] Specifically, Moore claims Ward received a substantial bond reduction in anticipation of his trial testimony. Also, Ward was never charged with murder and was permitted to plead guilty to confinement and arson, as Class B felonies, and received a nine-year sentence (which included three years due to a probation violation).

[9] The State has an affirmative duty to disclose material evidence favorable to the defendant. *State v. Hollin*, 970 N.E.2d 147, 153 (Ind. 2012). "[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. Evidence is material "if there is a reasonable likelihood that it might have affected the outcome of the trial." *Samaniego v. State*, 679 N.E.2d 944, 948 (Ind. Ct. App. 1997), *trans. denied*.

[10] The establishment of a *Brady* claim requires that the defendant show: "(1) that the prosecution suppressed evidence, (2) that the evidence was favorable to the defense, and (3) that the evidence was material to an issue at trial." *Minnick v. State*, 698 N.E.2d 745, 755 (Ind. 1998). The suppression of *Brady* evidence is constitutional error warranting a new trial. *Bunch v. State*, 964 N.E.2d 274, 298 (Ind. Ct. App. 2012), *trans. denied*.

[11] "*Brady* applies to evidence impeaching the credibility of State's witnesses." *Williams v. State*, 714 N.E.2d 644, 649 (Ind. 1999) (citing *United States v. Bagley*, 473 U.S. 667, 676 (1985)). However, the State will not be found to have

suppressed material evidence if it was available to the defendant through the exercise of reasonable diligence. *Bunch*, 964 N.E.2d at 297.

[12] In *Williams v. State*, 714 N.E.2d 644 (Ind. 1999), the Court considered a *Brady* claim in the context of the State's non-disclosure of an agreement not to prosecute a witness in a murder trial for the witness' alleged drug-related conduct. The Court concluded: "Because the 'deal' became known to Williams and the jury before the trial concluded, there was no *Brady* violation." *Id.* at 648.

[13] At Moore's post-conviction hearing, Ward confirmed that he had not, at the time of his trial testimony, been given something in return for his testimony. As for "an understanding," Ward testified: "[there were] no promises that I could grab . . . hold to. There was [sic] no specifics at all. None. No specifics, no details, no nothing." P-C.R. Tr. at 110-11. He acknowledged that he had never been charged with murder and that he had been released on bond shortly after his arrest. Former prosecutor Ralph Staples testified that the State had cooperated with Ward's bond reduction as a show of "good faith" during negotiations with Ward's attorney. *Id.* at 23.

[14] Despite his participation in some of the events surrounding the deaths of Johnson and Coleman, Ward was never charged with murder. And he was given a substantial bond reduction (from $250,000 to $25,000). Undoubtedly, Ward hoped that his cooperation would lead to future leniency. However, the

transcript of Moore's trial belies his assertion that information regarding a deal between the State and Ward was withheld.

[15] During opening statements to the jury, Moore's counsel asserted that Ward's credibility was suspect because of an implicit agreement with the State:

> [A]fter negotiations with the State of Indiana and striking what they call a 'gentleman's handshake' which I call 'you scratch my back, I'll scratch your back,' Curtis Ward starts telling a story implicating Paul Moore. I'm not going to go into the details of it because I'm going to tell you the truth, he's now denied everything on July 30th, now he comes back on August 6th with this story. This is after the deal with the State and you'll hear about the benefit that he has received and possibly could still receive for this cooperation.

Tr. at 104. When Ward testified, he acknowledged that he was not in jail but was "out on bond." *Id.* at 493. During cross-examination, defense counsel elicited Ward's acknowledgement that his bond had been reduced from $250,000 to $15,000 (plus an additional amount attributable to a probation violation). In closing argument, both the prosecution and defense counsel pointed out to the jury that Ward had been favorably treated by the State.

[16] The prosecutor advised the jury that Ward was facing charges of criminal confinement, arson, and assisting a criminal, and the prosecutor acknowledged the bond reduction:

> Curtis Ward hadn't made any deals with the State, let me make that clear. He may have received a benefit in getting a bond

reduction that he shouldn't have gotten, but he has received no deals for his testimony in this case.

*Id.* at 972. Thereafter, defense counsel vigorously argued that Ward had received benefits and still stood to gain from his testimony:

> [Ward] is truly [trying] to protect himself. Ms. Haley referred to how he has received a benefit already about the bond, yes, he has. I don't know if you're curious but reading of the charges he's facing, oops, Curtis is not charged with murder. And from this deal, there's no writings. It's a gentleman's handshake. After we finish here today, what's going to happen? Do you know? I don't. As far as I know Curtis' charge's [sic] dismissed. Who knows? I don't. Yes, he has a lot to gain, he is doing a wonderful job protecting himself.

*Id.* at 982. The jury was repeatedly advised of the dealings between the State and Ward. In light of the Indiana Supreme Court's guidance in *Williams*, we likewise conclude that any "deal" was known to Moore and the jury. Moore has shown no *Brady* violation.

### *Alleged Subornation of Perjury*

[17] We next turn to Moore's related allegation that the prosecutor suborned perjury and, thus, committed misconduct. "A conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is 'any reasonable likelihood that the false testimony reasonably affected the judgment of the jury.'" *Lyons v. State*, 600 N.E.2d 560, 564 (Ind. App. 1992) (quoting *United States v. Agurs*, 427 U.S. 97, 103 (1976)).

[18] At the conclusion of Ward's testimony on re-direct, the following exchange took place:

> Prosecutor: Mr. Ward, have you been promised anything in exchange for your testimony here today?
>
> Ward: No, I haven't.

Tr. at 538-39. Moore contends that the prosecutor thereby elicited perjury. According to Moore, Ward's answer was false because he had already received an unusually low bond and had reason to expect favorable treatment in the future.

[19] At the post-conviction hearing, Ward acknowledged he had denied the existence of a promise in exchange for his testimony. He added that the testimony had been "true," explaining further that there were "no promises that I could grab . . . hold to." P-C.R. Tr. at 108, 111. The former prosecutor corroborated that Ward had no plea agreement when he testified at trial. Thus, he denied suborning perjury.

[20] To the extent that the allegation of perjury implicates Ward's subjective belief that he testified truthfully, credibility determinations rest with the post-conviction court. To the extent that objective proof could be said to exist, the bond reduction had already been granted before Ward testified and was thus not a promise of future consideration. Also, Moore has produced no evidence of a plea agreement or other defined agreement preceding the testimony. Moore has not shown that the post-conviction court erred when it concluded

that Moore had not "carr[ied] his burden" to prove his claim of prosecutorial misconduct, which was based on the alleged subornation of perjury. Appellant's App. at 88.

*Effectiveness of Trial Counsel*

[21] Moore claims he was denied the effective assistance of trial counsel because counsel did not call Moore's grandfather, Charles Moore ("Charles"), as a witness. Although Charles was listed as a defense witness, ultimately he was not called to testify. According to Moore, his grandfather was in a unique position to challenge Ward's testimony that he was with Moore the morning after the murders.

[22] Effectiveness of counsel is a mixed question of law and fact. *Strickland v. Washington*, 466 U.S. 668, 698 (1984). We evaluate Sixth Amendment claims of ineffective assistance under the two-part test announced in *Strickland*. *Id.* To prevail on an ineffective assistance of counsel claim, a defendant must demonstrate both deficient performance and resulting prejudice. *Dobbins. v. State*, 721 N.E.2d 867, 873 (Ind. 1999) (citing *Strickland*, 466 U.S. at 687). Deficient performance is that which falls below an objective standard of reasonableness. *Strickland*, 466 U.S. at 687; *see Douglas v. State*, 663 N.E.2d 1153, 1154 (Ind. 1996). Prejudice exists when a claimant demonstrates that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *see Cook v. State*, 675 N.E.2d 687, 692 (Ind. 1996).

The two prongs of the *Strickland* test are separate and independent inquiries. *Strickland*, 466 U.S. at 697. Thus, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." *Id.*

[23]  We "strongly presume" that counsel provided adequate assistance and exercised reasonable professional judgment in all significant decisions. *McCary v. State*, 761 N.E.2d 389, 392 (Ind. 2002). Counsel is to be afforded considerable discretion in the choice of strategy and tactics. *Timberlake v. State*, 753 N.E.2d 591, 603 (Ind. 2001). Counsel's conduct is assessed based upon the facts known at the time and not through hindsight. *State v. Moore*, 678 N.E.2d 1258, 1261 (Ind. 1997). We do not "second-guess" strategic decisions requiring reasonable professional judgment even if the strategy in hindsight did not serve the defendant's interests. *Id.* In sum, trial strategy is not subject to attack through an ineffective assistance of counsel claim, unless the strategy is so deficient or unreasonable as to fall outside the objective standard of reasonableness. *Autrey v. State*, 700 N.E.2d 1140, 1141 (Ind. 1998).

[24]  At the post-conviction hearing, Charles testified that, around 8:30 a.m. on July 23, 2003, he was called to assist Moore with returning a rented Roto-Rooter. According to Charles, when he arrived at Moore's house, Moore was alone and Ward arrived "a couple minutes" later. P-C.R. Tr. at 68. In Moore's view, this testimony—had it been presented at trial—would have contradicted Ward's claim "that he was with Mr. Moore continually from the time he claimed Mr.

Moore killed Coleman and Johnson until after the two of them returned the Roto-Rooter the next morning." Appellant's Br. at 42.

[25] In support of his claim, Moore directs our attention to Ward's trial testimony appearing at pages 465 through 466 of the trial transcript. Our review of this testimony leads us to disagree with Moore's contention that Ward described completely uninterrupted companionship with Moore after the murders.

[26] In his trial testimony, Ward described the events leading up to and surrounding the murders and stated that he and Moore thereafter went "straight home."[1] Tr. at 465. According to Ward, at that time "it's light out, early morning." *Id.* The prosecutor then elicited testimony of subsequent activities:

> Prosecutor: When you two got back to 4302 East 39th Street what happened?
>
> Ward: I started heading for the house and he's going through his back yard, he asked me did I know where the shovel was and my reply was, where we left it last night. He still had a piece of the gun.
>
> Prosecutor: So he asked you about a shovel that morning?
>
> Ward: Right.
>
> Prosecutor: Did you see the Defendant, Paul Moore, do anything with that shovel?

---

[1] Ward claimed that he had been living at Moore's house. Moore testified that he lived alone but had given Ward a key.

Ward: I went in the house, I didn't go in the back yard with him.

Prosecutor: Did the two of you do anything else together that morning?

Ward: Got the Roto-Rooter together, put it in the car and took it back to wherever it had came [sic] from.

*Id.* at 465-66. Ward was not asked if he had parted company with Moore for any period of time that morning. As Ward did not testify that his time with Moore was uninterrupted, Charles's testimony that Moore was alone when Charles first arrived at Moore's house would have been tangential at best. Even had the jury credited testimony of Ward's arrival a "couple minutes" later, such would not directly contradict Ward's testimonial account of material events. P-C.R. Tr. at 68. We discern no prejudice from trial counsel's decision not to call Charles as a trial witness.

## Conclusion

In sum, Moore has not shown a *Brady* violation or that the prosecutor suborned perjury, and Moore has not established that he was denied the effective assistance of trial counsel. Accordingly, we cannot say that the post-conviction court's denial of Moore's petition for post-conviction relief is clearly erroneous. We affirm the post-conviction court's judgment.

Affirmed.

Baker, J., and Friedlander, J., concur.